Rachelle A. ROSENBERG, Plaintiff,

v.

UNIVERSITY OF
CINCINNATI, et al., Defendants.

No. C–1–77–039.

United States District Court,
S.D. Ohio, W.D.

May 11, 1987.

Charles G. Atkins, Cincinnati, Ohio, for plaintiff.

Christopher Barnes, James A. Hunt, Cincinnati, Ohio, for defendants.

RICE, District Judge.

This case is before the Court on Defendants' Motion to Decertify the Class (Doc. #71), which seeks to decertify the class defined by the Court's December 15, 1977 Order (Doc. #23) as:

All women who have been employed in faculty positions at the University of Cincinnati at any time between July 15, 1974 and the present who, it is claimed, have been discriminated against on the basis of sex by Defendants' claimed policies, practices and customs with respect to the terms of employment, compensation or tenure.

An evidentiary hearing was held before the Court on January 17 and 24, 1987, on the limited issue of "whether personnel decision-making at the University of Cincinnati is sufficiently centralized so that a common pattern or practice of employment discrimination based on sex could have occurred." Decision and Entry of September 29, 1986 (Doc. #107) at 16. Based upon the evidence presented at the hearing and the documentary evidence previously filed with this Court, and for the reasons set forth below, Defendants' Motion to Decertify the Class is hereby granted, and said class is accordingly ordered decertified. Plaintiff's Motion to Clarify Class Definition in Order to Determine the Temporal Scope of the

Class (Doc. # 90) is therefore deemed moot. In addition, the Clerk of Courts is ordered to send the notice of the class decertification (attached hereto) to all individuals who have responded to the class questionnaire, under the procedures set forth below. Finally, based upon discussions with counsel, and for the reasons set forth below, the Court's Order decertifying the class is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## A. DECERTIFICATION OF THE CLASS

As noted above, an evidentiary hearing was held in this case on January 17 and 24, 1987, on the limited issue of "whether personnel decision-making at the University of Cincinnati is sufficiently centralized so that a common pattern or practice of employment discrimination based on sex could have occurred." Decision and Entry of September 29, 1986 (Doc. # 107) at 16. Evidence at that hearing was limited to the issue of whether the class previously certified in this case met the requirements of Federal Rule of Civil Procedure 23(a), since the Court in considering the issue of class certification assumes that all allegations of discrimination made in the Plaintiff's Complaint are true. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).[1] At this hearing, the burden of proof was on the Plaintiff, in light of the fact that the Defendants had come forward with documentary evidence rebutting Plaintiff's *prima facie* showing that the requirements of Rule 23(a) had

been met. *See Valentino v. Howlett,* 528 F.2d 975, 978 (7th Cir.1976); *Berggren v. Sunbeam Corp.,* 108 F.R.D. 410 (N.D.Ill. 1985); *see also* 2 Newberg, Newberg on Class Actions §§ 7.17–7.22 (2d ed. 1985). Based upon the evidence admitted at the hearing,[2] and the documentary evidence filed by Plaintiff and Defendants, the Court concludes that Plaintiff has failed to meet her burden of showing that the Rule 23(a) prerequisites to the maintenance of a class action have been met.

Initially, the Court notes that Plaintiff and Defendants agree as to the basic framework of the hierarchical decision-making structure at the University of Cincinnati. At the top of this hierarchy is the Board of Trustees (formerly Board of Directors). Below the Board of Trustees is the President of the University, and below the President is the Senior Vice President and Provost.[3] Under the Senior Vice President and Provost are the Deans of the respective colleges within the university, and below the Dean of each college are the departmental chairmen of the departments within each college. Under each departmental chairman are the individual faculty members of that department. However, while agreeing that this is in fact the order of hierarchy at the University of Cincinnati, Plaintiff and Defendants disagree as to the amount of deference each higher level is required to give to the recommendations of the lower levels of the hierarchy, and particularly the amount of deference the

---

1. While the Court notes that it is often unnecessary to conduct an evidentiary hearing on the issue of whether the requirements of Rule 23(a) have been met, in the present case the complexity of personnel decision-making at the University of Cincinnati made such a hearing appropriate. *See Franks v. Kroger Co.,* 649 F.2d 1216, 1223–24 (6th Cir.1981).

2. The Court notes that it finds the report of the Commission on Institutions of Higher Education of the North Central Association of Colleges and Secondary Schools (Defendant's Exhibit B) to be inadmissible as hearsay not falling within any of the exceptions to the bar to admission of such evidence set forth in Federal Rule of Evidence 802. Defendant has argued that this report falls within the exception for public reports found in Rule 803(8)(C). However, Defendant has failed to show that the North Cen-

tral Association of Colleges and Secondary Schools is a public office or agency or that the report resulted from an "investigation made pursuant to authority granted by law," and so the Court must find that the exception contained in Rule 803(8)(C) to the general rule against the admission of hearsay evidence does not cover this exhibit. The Court therefore sustains Plaintiff's objections to the admission of this document, and accordingly has not considered it in reaching the conclusions contained in this entry.

3. At the University of Cincinnati there is also a Senior Vice President and Director of the Medical Center, who has authority similar to that of the Senior Vice President and Provost with respect to the medical colleges and hospitals of the university.

Provost is required to or does give to recommendations from deans and department chairmen. As the Court found in its Decision and Entry of September 29, 1986, (Doc. # 107) that issue (in other words the centralization of decision-making at the University of Cincinnati) is the pivotal issue with respect to the viability of class certification in this case.

### 1. *Promotion, Tenure and Reappointment*

■ In evaluating the degree of centralization at the University of Cincinnati, the Court will first consider the degree of such centralization with respect to promotion, tenure and reappointment decisions, since the majority of the evidence presented at the evidentiary hearing goes to this issue. In considering this evidence, the Court must note that 1977 is a crucial dividing line—prior to 1977, the Provost did not review negative recommendations for promotion or tenure made at either the departmental or college levels, but after 1977 the Provost reviewed all such recommendations whether positive or negative.

Considering the evidence presented of post–1977 period practices, when the Provost reviewed all recommendations, the Court finds that Plaintiff has failed to show the existence of sufficient centralization of decision-making at the university to meet the prerequisites of Rule 23(a) either with respect to a common, class-wide pattern or practice of discrimination or with respect to Plaintiff's claims of discrimination being typical of any class of faculty members allegedly discriminated against. In reaching this conclusion, the Court initially notes that the relevant issue is the actual practice at the University of Cincinnati, not theoretical legal restrictions on those practices. In other words, Plaintiff's discussion of the legal authority of the Board of Trustees with respect to promotion, tenure and reappointment is relevant only insofar as it may be an indicia of actual practices at the university, since the question before the Court is whether the requirements of commonality and typicality under Rule 23(a) could exist at the University of Cincinnati, not whether the Board of Trustees at the university has exceeded the scope of permissible delegation of powers under Ohio law.

After review of the evidence presented at the hearing and the documentary evidence filed, the Court finds that in the period after 1977, the University of Cincinnati was sufficiently decentralized with respect to promotion, tenure and reappointment decision-making so as to make class-wide relief for any discriminatory acts or practices impossible. The university required promotion and tenure decisions to be based upon the general factors of teaching, research and scholarship, public and professional service and university service. Each department, however, was free (and encouraged) to develop its own criteria, to determine, based upon the particular mission of that department, what weight it saw fit to give the aforementioned ingredients in arriving at a promotion and tenure decision. In other words, one department might value teaching above research and scholarship, or the public and university service components, whereas another department might put primary emphasis on research and scholarship, giving minimal emphasis to teaching or either of the service components. The departments were free to develop their own criteria, with the Provost exercising review only to make certain that each department adequately considered all of the above components in developing its own criteria for promotion and tenure.

Once a promotion and tenure decision reached the Provost, that officer's review of a department's promotion and tenure decision was limited to making certain that the department followed its own criteria. There was no university-wide tenure and promotion committee. The Provost would not substitute his own independent judgment for that of the department in the area of teaching competency and effectiveness, scholarship and research, or service. It was the Provost's function to make certain that the department followed its own individually developed criteria. In short, the Provost was to make certain that the promotion or tenure decision, based upon de-

partmental criteria, was supported by that particular candidate's file.

The only exception to this practice of provostal review indicated by the evidence was in the case of recommendations *for tenure* in which the candidate's file did not support a conclusion that the applicant had met all of the departmental criteria. In such a case, where for example an applicant who was an exceptional teacher did not, at least on the facts shown by the file, meet the departmental criteria for scholarship and research, the Provost had the discretion to in effect give *more* deference to the departmental recommendation by not blocking its recommendation for tenure. The Provost, however, would *not* accept a negative recommendation when a candidate's file indicated he or she *had* met the departmental criteria.

Considering this structure in light of the requirement of centralized decision-making sufficient to create the possibility of commonality or typicality as discussed in its September 29, 1986 Decision and Entry, the Court finds that the prerequisites of Rule 23(a) have not been met. Quite simply, the Court finds that the Provost's review of promotion and tenure decisions did not create a pattern or practice sufficient to meet the commonality requirement of Rule 23(a), because each review of a promotion or tenure recommendation was, in light of the strict limitation upon the Provost's power of review, inextricably tied to the particular department's criteria and evaluative findings. Given this lack of a common pattern or practice, Plaintiff's claim of discrimination also could not have been typical (as that word is used in Rule 23(a)) of sex discrimination in denials of tenure or promotion at the University of Cincinnati after 1977, even had Plaintiff's claims arisen in that time period.

However, Plaintiff's claim did not arise in the period after 1977. Plaintiff's claim, therefore, could be, at most, typical only of those female faculty who sought and were denied tenure at the departmental or college level and for whom there was no provostal review available, in the years 1974 through 1977. Because Plaintiff's claim could be typical only of such claims, the relevant issue for the Court on the Motion to Decertify is whether a common pattern or practice of discrimination could have existed against those females who received negative recommendations for promotion or tenure at the departmental or college level which were not reviewed by the Provost in the years 1974 to 1977.

Initially, in reviewing that period, the Court notes that a failure to review negative recommendations is in a sense a "common pattern or practice," since all applicants receiving negative recommendations are treated identically by the Provost. However, this pattern or practice of no provostal review actually creates more departmental autonomy, and consequently less centralization of decision-making at the University of Cincinnati than does the post–1977 practice of reviewing all recommendations. Common inaction (i.e., absence of provostal review) creates commonality for class certification purposes only if a causal connection between that inaction and the discrimination at the departmental level is shown, either by statistical or anecdotal evidence. In other words, a failure by the Provost to review actions which may be discriminatory can be said to create a common pattern or practice of discrimination for class action purposes only if there is some proof that the underlying acts of discrimination are somehow caused to be similar to each other by the failure to review. This is because of the fact that below the provostal level decision-making with respect to promotion and tenure is too decentralized (i.e., individual departments and colleges are too autonomous) for a common pattern or practice of discrimination to exist, unless that pattern or practice was caused by the lack of provostal review. In this case, neither the evidence presented at the hearing nor the documentary evidence filed prior to the hearing shows, either statistically or anecdotally, any causal connection between the lack of provostal review and the underlying departmental or college-level acts of discrimination. Absent such a causal connection, the structure of tenure and promotion decision-making at the University of Cincinnati between 1974

and 1977 could not, given the autonomy of the departments and colleges in this area, have permitted a common pattern or practice of sex discrimination to have occurred —any sex discrimination that occurred would have developed out of the autonomous decision-making within that department or college and would thus have had to have been unique and individual to that particular department or college.

While it might be argued that a common question of law or fact arises out of the lack of provostal review, because this lack of review may or may not act as a university ratification of departmental or college-level sex discrimination, the Court disagrees. In a Title VII case, the relevant issue is whether the employees of a defendant who engaged in acts of discrimination were acting as agents of the defendant, *see Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2408, 91 L.Ed. 2d 49 (1986); 42 U.S.C. § 2000e(b) (defining 'employer' to include agents thereof), not whether the defendant ratified the acts of its employees. In this case, there has been no indication that the agency status of department tenure committees, department chairmen or college deans will be an issue. Even were a question of agency to arise with respect to any or all of the potential class members claims, the issue presented (i.e., whether the particular committee, chairman or dean was acting within the scope of his, her or their employment) would be necessarily determined on the specific facts of a particular claim, and thus would not present a common question of fact or law within the meaning of Rule 23(a). Thus, absent showing of a causal connection between the lack of provostal review of negative tenure or promotion recommendations and acts of discrimination at the departmental or college level between 1974 and 1977 (a showing which has not been made), the Court must conclude that no common questions of fact or law exist sufficient to meet the requirements of Rule 23(a) because of the decentralizationof such decision-making at the University of Cincinnati.

■ However, even if the Court were to assume *arguendo* that a common, relevant issue of fact existed as to a class of plaintiffs with respect to whether lack of provostal review of negative promotion or tenure recommendations in the years 1974–1977 constituted university ratification of discriminatory acts (and that such commonality is sufficient to meet the requirements of Rule 23(a)), the Court would, nevertheless, also have to find that Plaintiff's claims are not *typical* of that class. Plaintiff pursued a grievance through the University (by means of a university-wide grievance committee) which ultimately resulted in ratification of the denial of tenure by the university president himself.[4] Since Plaintiff has identified no other potential plaintiffs who followed the grievance route to ultimate denial of tenure (i.e., by filing a grievance, pursuing that grievance to a university-wide grievance committee, and then appealing that grievance committee's recommendations to the university president), under Rule 23(a), the Court must find that she has failed to meet the typicality prerequisite for class certification.

Accordingly, the Court must conclude that the University of Cincinnati in the period between 1974 and 1977 was insufficiently centralized with regard to promotion and tenure decisions such as those concerning the Plaintiff (i.e., those which the applicant for promotion and tenure received a negative recommendation at the departmental or college level) for a pattern of practice of discrimination sufficient to meet the commonality requirement of Rule 23(a) to have existed, or in the alternative, that Plaintiffs claims are not typical of any common claims that could even arguably have arisen from the pattern and practice of promotion and tenure decision-making at the University of Cincinnati in that period.

**4.** If the case is viewed in agency terms, Plaintiff's claims are not typical of Title VII claims where no grievance process was followed, because in Plaintiff's case the university president acted on Plaintiff's grievance (i.e., he accepted a recommendation of a university-wide grievance committee to deny it) and so it would be unnecessary to determine if lower level employees of the university were acting within the scope of their authority.

### 2. *Other Personnel Policies*

■ Turning to other personnel policies (i.e., work conditions, salaries and hiring) at the University of Cincinnati, the Court finds that the evidence at the hearing and in the file shows that decision-making with respect to each of these practices was also not sufficiently centralized to permit class action type relief.

Evidence of such decentralized decision making is clearest in the context of work conditions such as allocation of office space and class scheduling. Within the confines of the allocation of blocks of space and time by the university, such work conditions were determined solely at the departmental level, without university-wide review.

Salary decisions were also made at the college and departmental levels based upon a general allocation of available funds. In the period prior to the collective bargaining agreement between the university and the American Association of University Professors ("AAUP") going into effect (September, 1975), the only exception to departmental and college control over salary determinations was the salary equity adjustment system, which allowed female and minority faculty members to seek adjustments to their salaries when they believed the university or college determination of their salary was discriminatory. Plaintiff has made no allegation that this equity adjustment system was somehow discriminatory, and so the Court must find that prior to September, 1975, the university was not structured such as to allow a *common* pattern for practice of salary discrimination. After September, 1975, and the adoption of the AAUP Collective Bargaining Agreement, faculty members received across-the-board increases in salary as set by that contract. Merit increases continued to be administered at the departmental and college levels. The AAUP contract, thus, did not increase the centralization of salary decision-making in any way which could have permitted a common university-wide policy and practice of salary discrimination.

Similarly, the evidence at the hearing and in the file shows that in hiring the university was structured so that no common university-wide pattern or practice of sex discrimination could have occurred. Once budget money was approved at the provostal level for addition of a particular faculty position (a decision made independent of and usually prior to consideration of candidates for a particular position), hiring decisions were made exclusively at a departmental and college levels. The testimony indicated that the only exception to this practice was when a faculty member was brought in at a tenured position. Since Plaintiff was not hired as a tenured faculty member, her claim is not typical of such hirings. Accordingly, the Court must conclude that with respect to hiring decisions, no pattern or practice which could have permitted common, university-wide sex discrimination existed at the University of Cincinnati.

The Court must therefore conclude that with respect to all of the personnel decisions at the University of Cincinnati—hiring, salary, work conditions, tenure, promotion and reappointment—no centralized policy or practice existed which could create common questions of law or fact sufficient to meet the requirements of Rule 23(a). Accordingly, the Court finds that the class certified by the Order of December 15, 1977 (Doc. # 23) must be ordered decertified and this case proceed solely on Plaintiff's individual claims. In light of the decertification of the class, Plaintiff's Motion to Clarify Class Definition in Order to Determine the Temporal Scope of the Class (Doc. # 90) is deemed moot.

### B. NOTICE

When a Court decertifies a class action lawsuit, "notice of the decertification is required only to the extent necessary to reach those potential class members who received notice and relied on being included in the class." *Hervey v. City of Little Rock*, 787 F.2d 1223, 1230 (8th Cir.1986); *see also Hardy v. Vought Corp.*, 26 Empl. Prac.Dec. (CCH) ¶ 32,048 (1979); *Miller v. Central Chincilla Group*, 66 F.R.D. 411 (S.D.Iowa 1975). In the present case, on Defendants' motion (Doc. # 60), notice of

the class action was sent to women employed in faculty positions at the University of Cincinnati at any time between July 15, 1974 and December 15, 1977 by the Plaintiff. *See* Doc. # 66. Answered questionnaires which accompanied that notice were to be returned to the Clerk of Courts. *See* Entry of April 23, 1981 (Doc. # 65). Accordingly, because members of the former class who returned the questionnaires received notice of the initial class certification and may have relied upon being included in that class, the Court hereby orders that the Clerk of Courts send the notice of the decertification of this class action attached hereto to all individuals who returned the questionnaire by ordinary mail. The expense of this mailing shall be taxed as costs.

## C. CERTIFICATION FOR INTERLOCUTORY APPEAL

Finally, after discussion with counsel in this case regarding the Court's intent to decertify the class, and the expression by Plaintiff's counsel of a desire to seek interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the Court finds, pursuant to that statute, that this Order should be certified for interlocutory appeal because it "involves a controlling question of law as to which there is substantial ground for difference of opinion" and because "an immediate appeal from the Order may materially advance the ultimate termination of the litigation." Specifically, the Court finds that neither the Sixth Circuit nor the Supreme Court has addressed the precise issue raised by Defendants' Motion to Decertify the Class, i.e., the degree of commonality and typicality necessary to maintain a class action in a university faculty context. Moreover, the Court notes that the Supreme Court has found that § 1292(b) may be an appropriate vehicle for reviewing a denial of class certification. *See Deposit Guarantee National Bank of Jackson, Mississippi v. Roper*, 445 U.S. 326, 336 n. 8, 100 S.Ct. 1166, 1173 n. 8, 63 L.Ed.2d 427 (1980).

In sum, the Court has granted Defendants' Motion to Decertify the Class (Doc. # 71), and hereby orders decertified the class certified by the Order of December 15, 1977 (Doc. # 23). Plaintiff's Motion to Clarify Class Definition in Order to Determine the Temporal Scope of the Class (Doc. # 90) is hereby deemed moot. The Clerk of Courts is ordered to serve the notice of the decertification of the class attached hereto by ordinary mail on all individuals who responded to the class questionnaire, with the expense of such notice to be taxed as costs. Finally, the Order Decertifying Class is hereby certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).