Jacqueline C. STAMBAUGH,
et al., Plaintiffs,

v.

KANSAS DEPARTMENT OF
CORRECTIONS, et al.,
Defendants.

No. 92–4297–SAC.

United States District Court,
D. Kansas.

Oct. 8, 1993.

---

William S. Robbins, Jr., Jon A. Blongewicz, Fairchild, Stang, Beal, Barber & Sanders, Kansas City, MO, for plaintiffs.

Timothy G. Madden, Kansas Dept. of Corrections, Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the plaintiffs' motion to certify (Dk. 11) their class action as maintainable pursuant to Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure. The defendants oppose the plaintiffs' motion on several grounds. On the plaintiffs' request, the court conducted an evidentiary hearing on this motion on September 21 and 22, 1993.

## I. BACKGROUND

The plaintiffs are female employees with the Department of Corrections ("DOC"). When they filed their underlying charges of discrimination in April and May of 1991 with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission, each of them worked at the Ellsworth Correctional Facility. The plaintiff Jacqueline Stambaugh was a Correctional Counselor II; the plaintiff Linda Hoag was an Office Specialist; the plaintiff Susan Lenoir was a Correctional Specialist III; the plaintiff Carol Strutt was a Correctional Counselor I; and the plaintiff Sharon Talebi-Shull was a Correctional Counselor II. In their underlying charges, each of the plaintiffs alleged that she had suffered discrimination on the basis of sex while working at the Ellsworth Correctional Facility.

In their complaint, the plaintiffs allege that the DOC maintains a pattern and practice of discrimination in hiring, promoting and transferring females; in retaliating against female employees who voice opposition to perceived sex discrimination; and in condoning or promoting a discriminatory work environment that constitutes sexual harassment. They allege such discrimination violates Title VII, 42 U.S.C. § 2000e *et seq.*, and the Kansas Acts Against Discrimination ("KAAD"), K.S.A. 44–1001 *et seq.*

The plaintiffs' class action complaint and motion for certification request a class covering all of their claims regarding promotion, hiring, transfers, retaliation, and sexual harassment. At the hearing, the plaintiffs narrowed their proposed class to those female employees of DOC on or anytime after March 4, 1985, who have been denied or will be denied promotions under the selection process required by DOC's Internal Management Policy and Procedure (IMPP) or who were removed or will be removed as Equal Employment Opportunity ("EEO") representatives. The plaintiffs also clarified at the hearing that their class action claims are pursued principally on a disparate impact theory while reserving their right to introduce evidence of a pattern or practice of discrimination occurring throughout the DOC's facilities. As for the employment policy having a discriminatory impact, the plaintiffs point to the IMPPs that purportedly give the wardens, as the appointing authorities, unsupervised discretion to select whomever they want for a particular promotion. The court will focus on the allegations, evidence, and issues pertinent to these promotion and retaliation claims on which class certification is sought.

## II. TITLE VII THEORIES

Superimposed on a court's application of Rule 23's requirements to an employment discrimination class action is the legal framework governing Title VII theories for disparate treatment and disparate impact. *See Stastny v. Southern Bell Tel. & Tel. Co.*, 628 F.2d 267, 273 (4th Cir.1980). A court cannot assess the requirements of commonality, typicality and adequacy of representation are met without examining the specific factual claims and legal theories being advanced by the individual plaintiffs and the class. "Central to both theories of liability where class-wide sex (as other) discrimination is alleged

is the existence of an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in substantially, if not completely, comparable ways." *Id.* In fact, the inquiry into commonality keys on the pattern and practice element shared by both substantive theories. 628 F.2d at 274. Accordingly, a court must keep in mind how the pattern and practice allegations function under the respective Title VII theories.

Class actions pursued under a disparate treatment theory rely on allegations and proof that discrimination in the defendant company was its "standard operating procedure—the regular rather than the unusual practice." *International Broth. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). The class must show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.; see Pitre v. Western Elec. Co., Inc.,* 843 F.2d 1262, 1267 (10th Cir.1988). Statistical evidence generally plays a major role in proving a pattern and practice. *Wagner v. Taylor,* 836 F.2d 578, 592 (D.C.Cir.1987). Statistics, however, are not required and do not preclude evidence of individual discriminatory acts. *See Pitre,* 843 F.2d at 1267; *Wagner,* 836 F.2d at 592. The class representatives often offer both kinds of evidence to prove their class disparate treatment claims. *Wagner,* 836 F.2d at 592.

Class actions pursued under a disparate impact theory have a different focus. Unlike disparate treatment, the disparate impact theory does not require the plaintiff to prove discriminatory motive or intent. *International Broth. of Teamsters v. United States,* 431 U.S. 324, 336 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). This theory addresses those "employment practices [and policies] that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* "[T]he necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). "To establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." *Ortega v. Safeway Stores, Inc.,* 943 F.2d 1230, 1242 (10th Cir.1991). The plaintiffs may look to statistics to show the disparate impact. *Id.* at 1243. " '[D]iscriminatory impact cannot be established where you have just one isolated decision.' " *Reidt v. County of Trempealeau,* 975 F.2d 1336, 1341 (7th Cir.1992) (quoting *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 451 (10th Cir.1981)).

## III. FACTUAL BASIS TO CLASS CLAIMS

### A. *Promotions*

In counts one and two of their complaint, the plaintiffs allege a pattern and practice by the defendants of discrimination in promotions. The complaint refers to two instances where one or more of them applied for a promotion at the Ellsworth Correctional Facility and were not selected and the promotion was given to a male employee having less qualifications. Theses counts also contain allegations that the plaintiff Stambaugh applied for a position for which the interview board had as a member a male employee against whom she had filed an EEO complaint. The warden denied her request to have this male employee removed from the interview board. Counts one and two include no allegations that the IMPP on promotions has a disparate impact against women. Instead, the plaintiffs allege at ¶ 49 that the defendants' discriminatory actions were intentional.

The plaintiffs testified at the hearing about these three promotion opportunities. In large part, their testimony was self-serving opinions and insubstantial accusations of unfairness. On the Correction Manager I or Major position given to Robert Murrell, the plaintiffs testified that the selection process was a sham, because Warden Harrison had decided in advance to promote Murrell and

then served on the interview board, chose one of Murrell's neighbors to serve on the interview board, prepared the interview questions, and waived the educational requirement for Murrell. There was no evidence presented that Warden Harrison improperly influenced the interview board, that Harrison did not pick the applicant ranked first by the interview board, or that Harrison did not consider the interview board's recommendations and comments in making his selection. In the plaintiffs' judgement, it is unfair and constitutes discrimination if the warden has any opinion on who is the best applicant before hearing from the interview board. On the Correction Counselor II position, the plaintiffs offered testimony that this promotion was denied to the plaintiff Strutt, who held a Correction Counselor I position at the time, and was given to Robert Stefek, who had no experience as a correction counselor and had served only as the chaplain. There was also evidence that, in response to chiding from the plaintiff Talebi–Shull on why he could not even do the work expected of a Correction Counselor I, Stefek admitted his promotion was due to the "good old boys network." Again, there was no evidence that the interview board was unfair or influenced by the warden or that the warden ignored the interview board's recommendation and comments and chose Stefek over a female employee. As to the Correctional Specialist II position, the plaintiffs presented evidence that the plaintiff Stambaugh applied for this position and then requested the Warden to remove William Finke from the interview board for that position, because she had filed an internal EEO complaint against him. On the advice of the Human Resource Manager and Affirmative Action Director in the DOC's Central Office, the warden refused her request. Stambaugh was not selected for that position.

The DOC maintains an IMPP governing the selection process for filling vacant positions within the DOC. The IMPP applies to all DOC facilities. The process entails an oral interview before an interview board consisting of three or more persons. The applicants are asked the same questions, and each interviewer separately scores the applicant's answers. The interviewers are to record their scores at the conclusion of each interview. After completing the interviews, the board then completes an applicant assessment form which ranks the applicants, gives reasons for the ranking, and explains the recommendation of one applicant over another. The interviewers' scores and recommendations are forwarded to the person making the selection decision, which in most instances is the warden of the facility. The IMPP requires the hiring authority to review the interview results and reasons for recommendation. If the applicant chosen did not receive the highest recommendation, the person must provide a job-related reason for the decision. (Exhibit D63, Attach. C at 4). The IMPP effective March 22, 1991, Exhibit D64, further requires the appointing officer to select the top scoring candidate if he or she is a member of a protected class in an "underutilized category" or to provide a written justification to his or her supervisor for departing from the recommendation. The supervisor along with other DOC officials must review and approve the justification before the selection is final.

The plaintiffs also testified as to their service on interview boards. The plaintiff Talebi–Shull said she has served on three or four different interview boards, and each time the warden selected the individual that the board ranked first. Concerning her experience on an interview board at the Larned Facility, the plaintiff Hoag believes it was inappropriate that a female Classification Administrator serving on the board suggested which applicant she preferred and another board member changed his interview scores in favor of that applicant. The plaintiff Lenoir opined that interview boards feel pressured to recommend persons preferred by the warden.

Counsel for the plaintiffs argued at the hearing that the IMPPs give the wardens "unbridled discretion" in choosing whomever they want for the vacant position. The plaintiffs believe the interview boards to be nothing but a sham since the ultimate selection decision is left to the wardens. Without direct supervision from DOC's Central Office, it is the plaintiff's opinion that wardens can carry on a "good old boy" system of rewarding promotions. The plaintiffs con-

clude that the DOC's policy of leaving promotion decisions to the warden has a disparate impact on female employees.

### B. *Retaliation*

In counts three and four of their complaint, the plaintiffs allege a pattern and practice of retaliating against female employees who voice opposition to perceived sex discrimination. At the close of hearing, the plaintiffs circumscribed their retaliation class to female EEO representatives who were removed from that position by the warden. The plaintiffs allege that the plaintiff Hoag was discriminatorily removed from the EEO representative position for informing officials and administrators of perceived discrimination and that the plaintiff Lenoir also was discriminatorily removed from the same position after filing her discrimination charge with the EEOC.

The plaintiff Hoag testified that Warden Harrison told her that too many EEO complaints from Ellsworth were going to Topeka, that she was the only EEO representative of the three at Ellsworth to have forwarded complaints to Topeka, and that officials in Topeka wanted them stopped. In March of 1991, Warden Harrison approached her and asked her to resign as EEO representative without giving her a reason. At the time, Warden Harrison told the plaintiff Hoag that he hesitated to do so because it could appear as retaliation. Hoag testified that she believed her responsibility as EEO representative was to represent the complaining employees. The plaintiff Lenoir testified that after filing her underlying discrimination charge with the EEOC she saw a posted memo announcing the upcoming selection of new EEO representatives. Warden Harrison picked both a female employee and a male employee as the new representatives.

Counsel for the plaintiffs argued at the hearing that the IMPPs give wardens "unbridled discrimination" to remove employees from their EEO representative positions. In the plaintiffs' opinion, this policy has a disparate impact on female employees serving as EEO representatives as evidenced by the removal of the plaintiffs Hoag and Lenoir.

## IV. CLASS ACTION—ANALYSIS

### A. *Background and Burdens*

Pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure, the plaintiffs seek to certify and represent a class consisting of:

> All female employees of the defendant DOC on or anytime after March 4, 1985 and who have been or will be denied promotions under the selection process required by the DOC's IMPP or who have been removed or will be removed as EEO representatives by the warden.

This narrower definition of the putative class comes from the plaintiffs' counsel arguments at the hearing.

Class actions are a procedural mechanism offering economy and efficiency in litigation. They conserve " 'the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.' " *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979)). They also "reduce the threat of repetitive litigation, ... prevent inconsistent resolution of similar cases, and ... provide an effective means of redress for individuals whose claims are too small to make it economically viable to pursue them in independent actions." *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 732 (4th Cir.) (quoting Tentative Draft No. 1 issued by the American Law Institute Complex Litigation Project and prepared for 1989 Annual ALI Meeting), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). The requirements of Rule 23 should be construed in light of these objectives. *Id.* at 729 n. 27 (citing 7A Charles A. Wright et al., *Federal Practice and Procedure* § 1754 at 52–54 (2d ed. 1986)).

Certification under Rule 23 consists of two steps. First, the proposed class action must satisfy the four requirements of subsection (a): (1) numerosity of parties; (2) commonality of legal and factual issues; (3) typicality of the claims and defenses of the

class representatives; and (4) adequacy of representation. If these are met, the action must qualify for one of the three categories in subsection (b). The plaintiffs here assert their action comes within the terms of (b)(2) and (b)(3).[1] Subsection (b)(2) covers suits for injunctive and declaratory relief, while (b)(3) permits suits where common issues of law or fact predominate and a class action is superior to any other available procedure for fairly and efficiently resolving the controversy. Essential, but implied, prerequisites are that a defined or identifiable class exists and that the class representatives are members of the class.[2] *In re A.H. Robins Co., Inc.*, 880 F.2d at 728; *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 659 (D.Minn.1991); *see Reed v. Bowen*, 849 F.2d 1307, 1310 (10th Cir.1988).

The decision to allow a class action to proceed or not rests in the district court's sound discretion. *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir.1982). The decision necessarily entails weighing the practical and prudential considerations, "most of which are purely factual or fact-intensive." *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir.1988) (citation omitted). In making the decision, the courts have erred in favor of certification since the decision is not set in stone, but is subject to later modification. *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969). The propriety of a class action depends on the facts of each case, and there is no error if the proper criteria are applied to the facts. *Reed*, 849 F.2d at 1309.

As the party seeking to certify a class, the plaintiffs have the " 'strict burden' " of proving each of the requirements of Rule 23. *Reed v. Bowen*, 849 F.2d at 1309. "The burden shall be upon any party seeking to maintain a case as a class action to present an evidentiary basis to the court showing

that the action is properly maintainable as such." D.Kan.Rule 209(d). Rule 23, however, does not authorize a court to inquire into the merits of a suit or to permit any such inquiry to influence its decision on certification. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). At the same time, the court may probe beyond the pleadings and consider the range of proof necessary to maintain the allegations of classwide discrimination. *Tucker v. Union Underwear Co., Inc.*, 144 F.R.D. 325, 327 (W.D.Ky.1992); *see Falcon*, 457 U.S. at 157, 160, 102 S.Ct. at 2370, 2732. In other words, the plaintiffs must provide more than bare allegations and cannot base a class action on the leap that since they were victims of discrimination then there must be other victims. *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir.1985). "[A] Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon*, 457 U.S. at 161, 102 S.Ct. at 2372. This determination can be made only from delving into the claims presented and the showing offered for class certification. *Wagner v. Taylor*, 836 F.2d at 587.

### B. *The Falcon Decision*

Discrimination cases generally are well-suited for class actions, as the alleged discrimination is often by its very nature class-based with classwide injuries and common legal and factual issues. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977). This is not to say that Rule 23's requirements are presumably satisfied in all employment discrimination cases. The Supreme Court made that clear in *Falcon*.

The plaintiff in *Falcon* filed a complaint alleging he was denied a promotion because

1. When an action qualifies under (b)(1) and/or (b)(2) and also under (b)(3), the court should order certification under (b)(1) or (b)(2), instead of (b)(3). 7A Charles A. Wright, et al., *Federal Practice and Procedure* § 1772 at 425–26 (1986). Because a member has the right to opt out under (b)(3), but not under (b)(1) or (b)(2), the policy goals of the latter subsections are frustrated if certification is made under (b)(3) and a class

member then opts out and brings separate litigation. *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir.1989).

2. Rather than devote a separate discussion to these implied criteria, this court will follow the lead of other courts and simply incorporate them into the analysis given the four prerequisites.

he was a Mexican–American. He further alleged that the employer maintained a policy and practice of discriminating against Mexican–American. His complaint, however, did not allege any facts concerning the defendant's hiring practices. Without an evidentiary hearing, the district court granted his motion to certify a class including Mexican–American employees subject to the promotion claim and Mexican–American applicants who had not been hired. The plaintiff's motion was supported by the rule in the Fifth Circuit that a victim of racial discrimination could "maintain an 'across the board' attack on all unequal employment practices alleged to have been committed by the employer pursuant to a policy of racial discrimination." 457 U.S. at 152, 102 S.Ct. at 2367 (citing *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir.1969)). After various rulings by the Fifth Circuit and the Supreme Court, certiorari was granted to decide whether the plaintiff could maintain a class action on behalf of applicants who were denied employment.

The Court reversed the certification order finding an inherent error in the across-the-board rule. 457 U.S. at 160, 102 S.Ct. at 2372. Courts are not to presume from a general allegation of class discrimination in employment practices that the plaintiff is a proper representative and that the requirements of Rule 23 are satisfied. A Title VII class representative must comply with the same prerequisites applicable to all class actions. 457 U.S. at 156, 102 S.Ct. at 2369. "[A]ctual, not presumed," compliance with Rule 23(a) is "indispensable." *Id.* at 160, 102 S.Ct. at 2372. Certification of a Title VII class action, as with any other class action, depends upon the trial court conducting a "rigorous analysis" and being satisfied with the plaintiff's compliance with Rule 23. *Id.* at 160, 102 S.Ct. at 2372.

Though acknowledging that discrimination is "by definition" class-based, the Court said the mere "allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified." 457 U.S. at 157, 102 S.Ct. at

2370. The Court explained this conclusion in these terms:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim.

*Falcon*, 457 U.S. at 157–58, 102 S.Ct. at 2370–71. The Court further observed that evidence the plaintiff was denied a promotion given to a non-minority person with less experience or qualifications would "not necessarily justify the inferences" that such discrimination is typical in the employer's promotion practices or that the employer's promotion practices are motivated by a pervasive discriminatory policy. 457 U.S. at 158, 102 S.Ct. at 2371. "These additional inferences demonstrate the tenuous character of any presumption that the class claims are 'fairly encompassed' within respondent's claims." 457 U.S. at 158, 102 S.Ct. at 2371. All Title VII cases would be potential class actions if a single allegation of discrimination supported a general attack on a company's policy and treatment of all other employees sharing the same protected status. 457 U.S. at 159, 102 S.Ct. at 2371.

With *Falcon* the Supreme Court has pulled in the reins on across-the-board attacks. Conclusory allegations of discrimination on a class-basis are not enough. Courts now insist on detailed allegations, affidavits and other evidence to determine if the individual claims share questions of law or fact with the class claims and if the individual claims are typical of those brought for the class. 5 Herbert B. Newberg, *Newberg on Class Actions* § 24.13, at 24–52—24–54 (3rd ed. 1992).

### C. *Numerosity*

■ The class must be of such a size that "joinder of all members is impracticable."

Fed.R.Civ.P. 23(a). "Impracticable does not mean impossible." *Robidoux v. Celani,* 987 F.2d 931, 935 (2nd Cir.1993). Some evidence or reasonable estimate of size is necessary, but the plaintiff need not prove the identity of each class member or the specific number of class members. *Id.* In short, numerosity is not judged against some absolute number. *Paxton v. Union Nat. Bank,* 688 F.2d 552, 559 (8th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983).[3] Besides size, relevant to the practicality of joinder are such factors like the inconvenience or inefficiency in trying individual suits, the ability of class members to bring their own suits, the size of the individual claims, a request for injunctive or declaratory relief, the nature of the relief sought, and the location and distribution of class members. *See Robidoux,* 987 F.2d at 936; *Bishop v. New York City Dept. of Housing Preservation & Development,* 141 F.R.D. 229, 235 (S.D.N.Y.1992).

■■■ The parties agreed to the following figures. The DOC's entire work force includes 794 female employees and 38 EEO representatives. At the Ellsworth Correctional Facility, there are 183.5 positions with 44 of them are held by women. Other than these general numbers, the plaintiffs have come forth with no reliable figures on the size of the promotion class or the retaliation class as both are presently defined.

The plaintiffs consider their putative class to consist of all 794 female DOC employees. This estimate, however, does not correspond logically with how the plaintiffs now describe their class. For example, one must assume that all female employees have sought or will seek promotions and, more specifically, will seek promotions to upper-level positions. The plaintiffs limit their allegations and evidence to such promotions where the warden influenced, directed, or exercised unbridled discretion during the selection process in fa-

vor of the preferred applicants. The plaintiffs made a point at the hearing of emphasizing the warden's elevated involvement in the interview process for the major position and contrasting this with the warden's limited involvement and general approval of the interview boards' recommendations for lower-level promotions. The plaintiffs offer no estimate of the number of qualified female employees seeking upper-level promotions.

A similar problem emerges when a closer look is taken of the proposed class for the retaliation claim. The plaintiffs presented nothing on the total number of female EEO representatives who currently serve in DOC facilities or who have been removed from their positions by the warden. Besides the instances involving the plaintiffs Lenoir and Hoag, there is no evidence or basis for inferring how many more, if any, female EEO representatives were removed from their positions by wardens.

Because the plaintiffs' evidence on size leaves many unanswered questions, other factors relevant to impracticability become important. The plaintiffs point to the geographic dispersion of the class and the injunctive relief which they seek for all female employees. Only if the class is allowed to extend to all DOC facilities[4] does the location of class members become pertinent, and even then it is not weighty here. The DOC's facilities are neither so numerous nor distant from Topeka as to make it difficult or impracticable for the class members to litigate individually their claims here. The plaintiffs work in the Ellsworth Correctional Facility, one of the farther DOC facilities from Topeka, and are represented by counsel from Kansas City, Missouri. The plaintiffs do seek injunctive relief for all current and future female employees of DOC. Joinder may be impractical if, like here, the plaintiffs seek injunctive relief for future employees. *See*

3. "[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable." *Robidoux v. Celani,* 987 F.2d 931, 936 (2nd Cir.1993) (citing 1 Herbert B. Newberg, *Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels* § 3.05, at 141–42 (2d ed. 1985)).

4. The plaintiffs did not offer any evidence on the size of the class if it were limited to the Ellsworth Correctional Facility. Nor do the plaintiffs give the court any basis to infer that beyond themselves there are still more female employees who were denied upper-level promotions because of the warden's exercise of unbridled discretion in the selection process there.

*Horn v. Associated Wholesale Grocers, Inc.,* 555 F.2d 270, 275 (10th Cir.1977). When such relief is sought, the courts will accept "speculative and conclusory representations" on size as sufficient. *Id.* at 275–76. Assuming the plaintiffs' class extends to all DOC facilities and, therefore, the class consists of more than themselves, the numerosity requirement is met.

### D. *Commonality*

 Commonality requires the individual's claim and the class claims to have common questions of law or fact.[5] Fed.R.Civ.P. 23(a)(2). A showing of commonality, along with typicality, bridges the gap from an individual claim to an existing class consisting of the representatives and other members having the same interests and the same or similar injuries. *Falcon,* 457 U.S. at 156, 102 S.Ct. at 2369. After *Falcon,* a general question of class-based discrimination in employment practices is not enough for commonality. *Griffin v. Dugger,* 823 F.2d 1476, 1490 (11th Cir.1987), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988); *Wheeler v. City of Columbus,* 703 F.2d 853, 855 (5th Cir.1983) ("Discrimination in its broadest sense is the only question alleged that is common to [the class representative] and the class she sought to create and represent. Under *Falcon* that is not enough."); *see Wagner v. Taylor,* 836 F.2d at 593 (Alleging a common threat of discrimination is not sufficient to establish commonality). "Plaintiffs cannot 'simply leap from the premise that they were the victims of discrimination to the position that others must also have been.'" *Gonzalez v. Brady,* 136 F.R.D. 329, 331 (D.D.C.1991) (quoting *Morrison v. Booth,* 763 F.2d at 1371). "The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." *Falcon,* 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15.

In looking for common questions, the courts recognize that they often result from the individual claims and the class claims sharing liability theories and proof. The chances of this sharing occurring increase when the claims focus on a particular employment practice or an identifiable pattern of employment practices. Consequently, a court usually probes the substance of the discrimination claims and decides whether they "are susceptible ... [to] class-wide proof." *Ross v. Nikko Securities Co. Intern., Inc.,* 133 F.R.D. 96 (S.D.N.Y.1990). As the Fourth Circuit has observed, commonality turns on the existence of a pattern and practice:

> It is in relation to the "pattern and practice" element of both substantive theories that the commonality criteria for class action maintenance become most critical in Title VII litigation. Indeed at this point the class action and merit inquires essentially coincide. For to answer the procedural questions—whether there is a sufficiently homogeneous class vis-a-vis an identified practice to permit binding or benefitting it by class judgment; whether the issues presented in respect of the putative class members' claims have sufficient commonality to permit their resolution on an unindividualized basis; whether the individual claim of a representative plaintiff is sufficiently "typical" to permit its use as the prototype for resolution of the common claims of the class; and whether, given the nature of the representative's claim, adequate representation of class members' claims can be assured from the representative's efforts—in effect requires answering the substantive question whether, under either of the available theories, there exists the requisite "pattern or practice" sufficiently and comparably affecting an identifiable class of employees.

*Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d at 273–74 (footnotes omitted); *see also Wagner v. Taylor,* 836 F.2d at 587 n. 60. In

---

**5.** Commonality and typicality "tend to merge" with both serving "as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. at 2370–71 n. 13.

the case at bar, the court must decide whether the plaintiffs have shown that a class of aggrieved female employees exist and that the class was aggrieved by the same identifiable employment practice or policy advanced in the plaintiffs' individual claims.

For it to identify the common questions, the court must be provided detailed allegations and, in some instances, evidentiary proof. Proof that each class member is the victim of the discriminatory practice, however, is not required. *Wagner,* 836 F.2d at 592. A combination of statistical and anecdotal evidence is often presented to sustain an inference that there is a class which shares common questions. *See, e.g., Bishop v. New York City Dept. of Hous. Pres. & Dev.,* 141 F.R.D. at 237; *Jenson v. Eveleth Taconite Co.* 139 F.R.D. at 660–61, 664–65.

A leading treatise summarizes the relevant case law in these terms:

> After *General Telephone Co. v. Falcon,* allegations alone of a pattern and practice of discrimination, as well as a conclusory finding of satisfaction by the court, are inadequate to satisfy the commonality requirement. What is necessary is a specific showing of underlying facts which might raise an inference of a common question of pattern and practice through allegations of specific incidents of discrimination, supporting affidavits, or evidence at the class certification hearing. Pleadings should be factual and specific.
>
> Factual disparities within the class will not bar certification when there are supported allegations of a pervasive policy of discrimination, unless the factual situation of the representative plaintiff is particularly unique. Conversely, an absence of supported allegations by the plaintiff of centralized employment decision making or a showing of decentralization by the defendant may result in a denial or reversal of class certification.

5 Herbert B. Newberg, *Newberg on Class Actions* § 24.21 at 24–89—95 (3rd ed. 1992).

▉ The plaintiffs contend their claims are based on the same course of conduct by the defendants and the same legal theories as that of the class claims. Specifically, the plaintiffs maintain that the common questions concern the DOC's IMPPs which give the wardens' "unbridled discretion" in the selection process to choose who they want and in the EEO process to remove EEO officers who process discrimination complaints.

From the plaintiffs' allegations and proof, the court cannot infer that there is an identifiable group of female employees throughout the DOC's facilities that have been aggrieved by the wardens' exercise of discretion under the DOC's IMPPs. The plaintiffs rely exclusively on anecdotal evidence. At most, their evidence sustains an inference that there exists a small group of women at the Ellsworth Correctional Facility who have been aggrieved by the warden's promotion decisions on upper-level positions. The plaintiffs argue that the court should infer there are aggrieved women in each DOC facility because the IMPPs apply departmentwide. In the court's view, such a conclusion qualifies as an assumption, not an inference. The assumption is revealed in this flawed elementary syllogism: because all wardens have discretion in the promotion process and their warden has denied them promotions due to their sex, then other wardens must discriminate against women in the promotions.

The plaintiffs have not bridged the *Falcon* gap. They have not shown more than the validity of their own claims. The court cannot infer that the discriminatory treatment which they suffered is typical of DOC's promotion practice, is motivated by a policy of sex discrimination that pervades DOC facilities, or is reflected in other DOC's practices such as the removal of EEO officers. *Falcon,* 457 U.S. at 158, 102 S.Ct. at 2371. The wide gap between an individual's claim of discrimination and the existence of a class of persons who have suffered the same injury cannot be bridged by conclusory allegations of several instances of discrimination in a single DOC facility.

The anecdotal evidence here does not come from a statistically significant number of aggrieved persons in the putative class. *See Bishop,* 141 F.R.D. at 237; *Ross v. Nikko Securities Co. Intern., Inc.,* 133 F.R.D. at 97 ("The testimonial proof must identify a sta-

tistically significant number of aggrieved persons. . . ."). The plaintiffs offer no statistics that upper-level positions in the DOC's facilities are held by a disproportionate number of men considering the relevant makeup of all qualified employees. *See Churchill v. Intern. Bus. Machines, Inc.,* 759 F.Supp. 1089, 1101 (D.N.J.1991); *Gonzalez v. Brady,* 136 F.R.D. at 331 ("Statistics generally are offered at the certification stage of litigation to show that a class-wide problem exists.") The plaintiffs' testimonial proof fails to establish the existence of an aggrieved class, and this is a requirement that applies to both disparate treatment and disparate impact Title VII claims. *See Ross v. Nikko Securities Co. Intern., Inc.,* 133 F.R.D. at 97, 98. Without statistics or at least anecdotal evidence from a statistically significant group, the court is left to assume that the selection process created by IMPPs has a significant disparate impact on an identifiable group of female employees. Assumptions cannot substitute for the rigorous analysis required by Rule 23. *See Falcon,* 457 U.S. at 161, 102 S.Ct. at 2372.

Promotion decisions at DOC are decentralized. With each promotion, an interview board is created unique to the facility and the position. Though the plaintiffs expressed disenchantment with much of the promotion selection process, they generally do not attack the interview boards as a discriminatory vehicle. The focus of their attack is on the final hiring authority vested generally with the warden of that facility. Consequently, the issue whether discrimination has occurred will depend on the specific facts of each promotion at the facility, in particular, the role, involvement and motives of the particular warden. Facing this hurdle, the plaintiffs offer the conclusory allegation that discrimination occurs as a result of no central office review of the wardens' promotion decisions. The plaintiffs, however, make no showing of a causal connection between the lack of central office review and the alleged acts of discrimination, and, without that, the court cannot find common questions of fact or law sufficient to justify class certification. *See Rosenberg v. University of Cincinnati,* 118 F.R.D. 591, 595 (S.D.Ohio 1987). There is nothing from which the court can infer that

the discriminatory practices at the Ellsworth facility pervade all the DOC facilities. In sum, the plaintiffs have utterly failed to show that an aggrieved class exists and that the claims of the putative aggrieved class share common questions of law and fact with the representatives' claims.

### E. *Typicality*

▮ Rule 23(a)(3) requires that the claims or defenses of the class representative be typical of the class. This requirement is met upon proof that the class claims the same general grievances as the representative. *Chaffin v. Rheem Mfg.,* 904 F.2d 1269 (8th Cir.1990). Sharing legal or remedial theories is enough even when the facts behind them may vary. *Jenson,* 139 F.R.D. at 665. Individual claims can be typical if they arise from the same event or course of conduct. *Edgington v. R.G. Dickinson and Co.,* 139 F.R.D. 183, 189 (D.Kan.1991). Despite factual dissimilarities, the representative's claim is typical if the principal contested issues to it "occupy essentially the same degree of centrality" as to the class claim. *Burka v. New York City Transit Authority,* 110 F.R.D. 595, 604–05 (S.D.N.Y.1986). Typicality does not require identical claims, *id.,* or "absolute homogeneity." *Tucker v. Union Underwear Co., Inc.,* 144 F.R.D. at 329.

▮ The requirement of typicality dovetails into an inquiry into the adequacy of representation. *See Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181, 1189 (10th Cir. 1975). Typicality insures the class representative's claims resemble the class's claims to an extent that an adequate representation can be expected. 7A Wright et al., *supra,* § 1764 at 232–33. Consequently, the inquiry on typicality addresses the potential for a conflict of interest existing when the class representative's interests or claims are antagonistic or adverse to those of the class. *Penn,* 528 F.2d at 1189; see *Olenhouse v. Commodity Credit Corp.,* 136 F.R.D. 672, 680 (D.Kan.1991). If the individual claim turns on particularly unique facts or circumstances or is subject to unique defenses, then the individual may not be an appropriate representative. *Sheehan v. Purolator, Inc.,* 103 F.R.D. 641, 652 (E.D.N.Y.1984), *aff'd,* 839

F.2d 99 (2nd Cir.), *cert. denied,* 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988).

■ As with commonality, there is a "wide gap" between proof of an individual claim of discrimination and proof of typicality. *Falcon,* 457 U.S. at 157, 102 S.Ct. at 2370. Certification is permitted only upon specific allegations or evidence showing that a class exists with similar grievances or a companywide policy or practice of discrimination exists. 5 *Newberg on Class Actions* § 24.26 at 24-106—24-108. Demonstrating typicality is not an onerous burden but requires more than conclusory allegations that unnamed class members suffered discrimination. *Paxton,* 688 F.2d at 562.

■ Much of what the court said under commonality could be repeated here, for commonality and typicality "tend to merge." *Falcon,* 457 U.S. at 157, 102 S.Ct. at 2370. The analysis can be summed up in the following fashion. For their claims to be typical, the plaintiffs must show an aggrieved class to exist. For their claims to be typical, the plaintiffs must show the same unlawful conduct was directed at or affected the class. For their claims to be typical, the plaintiffs must present some evidence from which to infer that the selection process for promotions is uniformly administered in a fashion that has a disparate impact against female employees. The plaintiffs have not meet any of these related thresholds. Their evidence and allegations support only their individual claims of discrimination at the Ellsworth Correctional Facility.

## V. CONCLUSION

The court will dispense with discussing the adequacy of representation and the proper categorization under subsection (b). The plaintiffs' class action does not clear the typicality and commonality hurdles when defined so as to include all DOC facilities. If limited to the Ellsworth Correctional Facility, the plaintiffs' class action fails the numerosity requirement. For all of these reasons, the court denies certification of the plaintiffs' class action.

IT IS THEREFORE ORDERED that the plaintiffs' motion to certify (Dk. 11) is denied.