**Jessie L. MORRISON, et al., Plaintiffs-Appellants,**

v.

**Linwood BOOTH, et al., Defendants-Appellees.**

No. 82–7285.

United States Court of Appeals, Eleventh Circuit.

June 25, 1985.

Rehearing and Rehearing En Banc Denied Aug. 12, 1985.

Vanzetta P. Durant, Montgomery, Ala., Brent E. Simmons, Washington, D.C., for plaintiffs-appellants.

Thomas R. Christian, Montgomery, Ala., William J. Samford, III, Opelika, Ala., for defendants-appellees.

Before GODBOLD, Chief Judge, RONEY and SMITH *, Circuit Judges.

GODBOLD, Chief Judge:

Plaintiffs-appellants, black employees of the State of Alabama, appeal a final judgment entered by the district court in favor of defendants-appellees on appellants' claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* (1982). They also appeal from the district court's decision on remand denying class certification pursuant to Fed.R.Civ.P. 23. We affirm in part, reverse in part, and remand for further consideration in light of this decision.

## FACTS

### A. Background

In 1973 the state legislature established the Alabama Department of Youth Services (DYS). Appellee George Phyfer was Director of DYS, and appellee Wayne Booker was DYS's Director of Institutional Services. Prior to bringing the then-current employees into the merit system as permanent employees of DYS, DYS and the State Personnel Department, with the aid of consultants from Auburn University, determined the merit system classification for each employee. Each employee was given the opportunity to contest his classification, and DYS changed some classifications. On June 4, 1975, all DYS employees were "grandfathered" into the merit system. State law required that no employee be grandfathered in at a lower position than he had previously held. When DYS was established every merit system department in Alabama was also subject to the judgments and successive orders of *U.S. v. Frazer*, 317 F.Supp. 1079 (M.D.Ala.1970).[1]

---

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. *Frazer* required in part that:

Permanent appointments to DYS positions are made from a list (certificate) of eligibles provided by State Personnel. The certificate of eligibles comes from either open competitive examinations (open to all qualified applicants) or from promotion examinations (open to only DYS employees). State Personnel determines whether to use an existing register of eligibles or to establish a new register by giving examinations. Department supervisors request certified lists of eligibles when vacancies occur. Once a person is appointed to a permanent position from the list, he is on probation for six months.

No open competitive examinations have been given for non-entry level positions since 1975, partially as a result of the Personnel Department's attempt to develop "validated" tests. Higher positions have been filled from promotion examinations or through reallocations. Reallocation permits a person not in the top three on the register to be promoted. If the employee has taken on duties outside his classification and DYS requests that the position be reallocated, State Personnel may reallocate it. If the position is reallocated, the person holding it may retain it if he is in the top 50% on the existing eligible list or ranks in the top 50% after the next examination.

2. Negro applicants shall be appointed to positions other than custodial, domestic, laborer or laboratory aide, when said Negro applicants are listed on a Certification of Eligibles, unless higher-ranking white applicants on the certificate are appointed to fill the vacancy (or all the vacancies) in the listed position, or unless the defendants determine that the Negro applicant is not qualified to perform the duties of the position, or is otherwise not fit for the position.

3. Defendants shall not appoint or offer a position to a lower-ranking white applicant on a certificate in preference to a higher-ranking available Negro applicant, unless the defendants have first contacted and interviewed the higher-ranking Negro applicant and have determined that the Negro applicant cannot perform the functions of the position, is otherwise unfit for it, or is unavailable. In every instance where a determination is made that the Negro applicant is unfit or unavailable, documentary evidence shall be maintained by the defendants that will sustain that finding.

\* \* \* \* \* \*

In addition to permanent employees, DYS has "provisional" and "temporary" employees. Provisional appointments are limited to 156 days and usually do not come from a list of eligibles. Temporary appointments are made from the register pending receipt of a certified list. They do not have to be made from the top of the register. Temporary appointments are limited to 120 days and may follow a provisional appointment if the employee has been placed on the list of eligibles.

Roebuck (now called Vacca) is a campus operated by DYS which maintains a training school for the rehabilitation of delinquent youth. Appellee Linwood is its superintendent. The campus consists of cottages where the youth reside with counselors and a main office (or the central or administrative office). For some period of time Roebuck helped administer a day treatment program in Birmingham called C.I.T.Y.

*B. Plaintiffs-appellants*

*1.* Ronald Bishop: Received provisional appointment as a student aide April 25, 1977. Appellee Booth fired Bishop September 14, fourteen days before the end of his appointment. He was not rehired.

1. A Certification of Eligibles for positions other than custodial, domestic, laborer or laboratory aide, containing the name of one or more Negro applicants, shall not be cancelled or returned with vacancies remaining unfilled unless each Negro applicant is appointed or is found to be unavailable or unqualified.

\* \* \* \* \* \*

1. The procedures to be followed by the defendants for making temporary appointments for positions (other than custodial, domestic, laborer, or laboratory aide) when there are Negro applicants on the employment register eligible for such positions shall be the same procedures as those for making permanent appointments.

317 F.2d at 1091–92. *Frazer's* findings of a "pattern or practice" of discrimination in state employment do not, however, collaterally estop state defendants from denying that actions taken subsequent to that decision are racially discriminatory. *See Giles v. Ireland,* 742 F.2d 1366 (11th Cir.1984).

*2.* Leroy Edwards: Received provisional appointment as a student aide April 20, 1977. He too was fired September 14, nine days before the end of his appointment. Edwards later received a permanent position as a Youth Services Aide Trainee.

*3.* William Pompey: Received provisional appointment that was terminated early. He was not rehired.

*4.* Anthony Warren: Originally hired at Roebuck in early 1975. He was grandfathered in as a Counselor I. September 16, 1977, he was suspended without pay with intent to terminate. He was fired after he and his attorney failed to appear at a hearing.

*5.* Arnold Fennell: Hired at Roebuck in 1973. He was originally classified, pursuant to grandfathering, as a Human Services Aide III but was appointed as a Counselor Aide I upon reconsideration. He later served as an acting Counselor I but without status as such. He was appointed Counselor I from a register September 20, 1978, but was demoted to Counselor Trainee March 19, 1978, one day before his probation status would have ended. He was replaced by a woman with permanent Counselor I status (three other Counselor I's were also demoted, including one with permanent status). Fennell was promoted to Counselor I on May 30, 1979, when a vacancy occurred.

*6.* Forrest Jackson: Hired in early 1975. He was grandfathered in as a Human Services Aide III. Jackson had a college degree, although appellees were not originally aware of his education. Jackson's classification, though challenged, was not changed because it was based on his experience rather than his education. February 8, 1978, his position was reallocated to Counselor Trainee. When he failed to score in the top 50% on the next exam, he was demoted in July 1978. He was promoted to Aide in August. Jackson resigned March 31, 1981.

*7.* Samuel Kimbrough: His situation is similar to that of Jackson, except that Kimbrough had no college degree, was promoted to Aide August 28, 1978, promoted to Counselor Trainee November 1, 1978, and has not resigned.

*8.* Morrell Todd: Hired at Roebuck in 1973. He was grandfathered in as a Counselor Aide. His position was subsequently reallocated to Counselor I. He scored in the top 50% of a promotional exam and received a permanent appointment as a Counselor I. He was promoted to Counselor II from a promotional register a few months later.

*9.* Jessie Morrison: Originally hired at Roebuck in 1974. She was grandfathered in as a Counselor II. She was transferred to C.I.T.Y. in December 1975. C.I.T.Y.'s director resigned in August 1976, and his duties were transferred to Morrison even though the director had been a Specialist II and Morrison was only a Counselor II (two levels below Specialist I). DYS sought to have Morrison reallocated as a Specialist I, but the State Personnel Department refused to allow this and required that the job be filled from the register. Morrison was not on the register. Morrison continued to fulfill the director's duties and was given several raises. When C.I.T.Y. was terminated she returned to Roebuck.

## DISCUSSION

### A. *Class action*

This case was remanded to the district court for a determination of whether class action was appropriate and, if it was, for further proceedings to determine the class claims, with a certified record to be supplied upon entry of a new judgment on the class claims. *See Morrison v. Booth,* 730 F.2d 642 (11th Cir. 1984).

On remand the district court directed the plaintiffs to submit to the court evidence in support of class certification. After considering plaintiffs' submission and the evidence submitted at trial, the court denied the motion for class certification and dismissed the class allegations.

In its denial the district court relied upon *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72

L.Ed.2d 740 (1982), for the proposition that a class action cannot be based solely upon the allegedly discriminatory treatment of a few employees: "If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential company-wide class action." *Falcon*, 457 U.S. at 157–59, 102 S.Ct. at 2370–71. The district court found that under either a disparate treatment "pattern or practice" theory or an adverse impact theory, appellants had not demonstrated that a significant number of black employees may have been discriminated against in promotions, in "grandfathering", or in reallocations so as to justify class certification.

The court further recognized that it could not conduct "a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). It correctly concluded, however, that while plaintiffs need not prove the merits of their claims at this stage, they must provide more than bare allegations that they satisfy the requirements of Rule 23 for class certification. Plaintiffs must show some nexus with the alleged class. *See Waller v. The Jim Dandy Co.*, 638 F.2d 1330 (5th Cir.1981).

Our review of the supplemental record of proceedings on remand reveals that the district court did not abuse its discretion in denying class certification under Fed.R.Civ.P. 23. Plaintiffs simply leap from the premise that they were the victims of discrimination to the position that others must also have been. The decision on remand is affirmed.

### B. Individual claims

Appellants also assert that each of them individually was a victim of racial discrimination. The guidelines for deciding

such a case are set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093. A plaintiff establishes a prima facie case of racial discrimination when he establishes that he is a member of a racial minority and that he was treated differently from similarly situated non-minority members. *See* 411 U.S. at 802, 93 S.Ct. at 1824; *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir.1984).[2] The burden of production then shifts to the defendant to articulate a legitimate (and legally sufficient) nondiscriminatory reason for its behavior. *See Crawford v. Western Electric Co.*, 745 F.2d 1373 (11th Cir.1984). The defendant, however, need not persuade the court that it was actually motivated by the proffered reasons; at no time does the ultimate burden of persuasion shift to the defendant. *See, e.g., Fowler v. Blue Bell, Inc.*, 737 F.2d 1007 (11th Cir.1984). The plaintiff may then challenge defendant's proffered reasons as pretextual. Whether those reasons were pretextual is a factual finding to be reviewed under the clearly erroneous standard. *See id.; see also Carmichael v. Birmingham Saw Works, su-*

---

**2.** In a disparate treatment case the plaintiff's burden is to show that he was treated differently because of his race. Whether a prima facie case has been shown is a fact question. The test is "whether an ordinary person could reasonably infer discrimination from the facts shown if those facts remain unrebutted." *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1443 (11th Cir.1985).

*pra* (intentional discrimination is an issue of fact).

The district court assumed arguendo that appellants had overcome their initial hurdle of establishing a prima facie case and also implicitly found that appellees had sustained their burden of producing legitimate, nondiscriminatory reasons for their actions. The court focused its attention upon the issue of pretext and held that appellants did not prove that appellees' asserted reasons were pretextual. Thus we center our inquiry on the question of pretext and decide whether the district court was clearly erroneous in finding that none of the appellants satisfied their burden of proving that appellees' proffered reasons for their employment decisions were pretextual.

*1.* Appellants Bishop, Edwards, and Pompey were black student aides fired before the end periods of their provisional appointments. Appellees' proffered reason for the firings was that pursuant to policy DYS was gradually reducing the number of provisional employees and that some of these employees had had poor attendance records. *See* 2 Rec. at 131–32.

Appellants respond that Michael Elliott and Stanley Pitts, two white employees, also received provisional appointments in early 1977. Neither was fired on September 14 when Booth fired Bishop, Edwards, and Pompey. Both were allowed to remain as employees at the end of their 156 days and both subsequently received temporary appointments. Pitts later received a permanent appointment.

The district court was not convinced that this group of appellants had even proved by a preponderance of the evidence a prima facie case, since along with the three blacks, one white student aide had also been fired, and since blacks comprised a majority of the student aides. The court found that, assuming a prima facie case, appellants still had not proved that appellees' proffered reasons were pretextual. Although two white provisional employees (Elliott and Pitts) eventually obtained permanent status, the majority of positions left vacant by provisional employees were filled permanently by blacks.

A review of the record indicates that the district court's findings of lack of pretext are not clearly erroneous. We affirm as to appellants Bishop, Edwards, and Pompey.

*2.* Appellant Warren was a Counselor I who was eventually discharged. While he contends that his discharge was racially motivated, the record overwhelmingly supports the district court's finding that he was terminated for abusing students, failing to cooperate with supervisors, and failing to attend an investigatory hearing where the charges against him were to be addressed. *See* 4 Rec. at 635–74. The district court's finding of no pretext was not clearly erroneous.

*3.* Appellants Fennell, Jackson, Kimbrough, and Todd contend that they were initially "grandfathered in" at too low levels and then later demoted as a result of intentional discrimination. They point primarily to the allegedly preferential treatment of two white employees, Randy Jones and James Putnam, as evidence of racial discrimination.

The contention as to Jones is meritless. He was a Counselor II working in one of the cottages. When Booth was appointed Superintendent, he moved Jones to the central office so he could assist Booth. Booth did not consider the other Counselor II's before deciding to move Jones. Jones received no increase in pay or classification, although he did gain some authority over the Counselor II's who remained in the cottages. Jones had seniority over the other Counselor II's in the cottages when Booth moved him.

Putnam was hired in 1973 and grandfathered in as a Supervisor I. He had no college degree, a requirement for Supervisor I, but he had experience as Director of Social Services. He later resigned. Putnam was rehired more than two years later as a Counselor I. His work during the interim was not related to his work at DYS. Putnam was rehired by DYS more than two years after his resignation. State Per-

sonnel Department rules require that former employees cannot be rehired more than two years after they leave unless their interim work is related to their work for the state.

Appellees contend that Putnam's initial "grandfathering in" did not evidence any preference (or racial motivation) because they were simply following Alabama law, which required that employees could not be "grandfathered in" at a lower salary or at an incomparable job classification. Appellees, however, offer no explanation for the apparent bending of the rules in Putnam's rehiring and do not address these appellants' claim that Putnam's rehiring evidenced preferential treatment for white employees at appellants' expense. Appellees concede that Putnam's reemployment violated state procedures. *See* 3 Rec. at 260.

Appellees further contend that all initial classifications were pursuant to non-discriminatory policy and note that, where appropriate, reclassifications were instituted. Demotions resulted from work force reductions mandated by funding problems. Demotions (or "bumpings") were pursuant to seniority and affected whites as well as blacks.

■ The district court found that appellees' proffered reasons were not pretextual, but the court did not address the issue of Putman's rehiring in violation of procedure and its relevance, if any, to these appellants' charges of intentional discrimination. The court's findings are not clearly erroneous. *See* 3 Rec. at 255, 277. Appellees not only proffered legitimate nondiscriminatory reasons for their treatment of this group of appellants but they also presented evidence substantiating their position. Appellants simply did not prove by a preponderance of the evidence that, in spite of appellees' largely undisputed testimony, preferential treatment given a white employee showed racial animus toward them. Neither did they establish that they were "similarly situated" to Putnam so as to make his treatment relevant to them.

*4.* Appellant Morrison, although for some time performing the duties of a Specialist I, was never promoted to that position. DYS had initially tried to have her classified as a Specialist I by reallocation. The State Personnel Department rejected this approach and required that the job be filled from the register. Morrison was not on the Specialist I register and was therefore ineligible for promotion. Appellees awarded her several raises, including some merit raises.

Morrison contends that she was not promoted because appellees were unwilling to bend the rules to help her because of her race. She points to their willingness to aid a white employee, Elizabeth Morton, as evidence of racial discrimination and to their willingness to break the rules for Putnam.

Morton was hired June 6, 1975, as a Human Services Aide. She was employed at C.I.T.Y. In September 1976 the director of C.I.T.Y. requested that Morton be reclassified as a Counselor I. When DYS officials learned that two black persons who had expressed a willingness to work at C.I.T.Y. were ahead of Morton on the register and that she had not scored in the top 50% on the last exam, the DYS officials decided not to request a register. Morton was subsequently transferred to Roebuck for two weeks where she was able to be promoted to Counselor I as she was at the top of the list of eligibles willing to work at Roebuck. After she was promoted, she was transferred back to C.I.T.Y. as a Counselor I.

Appellees contend that they attempted to promote Morrison but were rebuffed by the State Personnel Department. Moreover, they say that they did all they could to compensate appellant by means of raises.

■ The district court found that appellees' explanation was not pretextual and that they had made a good faith effort to promote Morrison and were thwarted by the State Personnel Department. This is a close question, but we conclude that the district court's finding of no pretext is clearly erroneous.

**1374**

First, appellees were willing to bend the rules to help one white employee, Morton. They conceded that there was some flexibility in established procedures and that they enjoyed some discretion in decisionmaking and thus such bending of the rules was possible. *See* 4 Rec. at 436. This possibility introduces subjectivity into employment decisions. We have always looked upon this with increased scrutiny, particularly in a case such as this where flexibility and subjectivity permitted appellees to circumvent *Frazer* and promote a white over two higher-ranking blacks. *See, e.g., Fowler v. Blue Bell, Inc., supra.*

Second, appellees were willing to break, rather than simply bend, the rules for another white employee, Putnam. Departures from normal procedures may be suggestive of discrimination. *See Jean v. Nelson,* 711 F.2d 1455 (11th Cir.1983). And third, appellees' attempt to compensate Morrison monetarily in light of their inability to promote her was not as great an effort as suggested by the district court. Several of the raises were routine, cost-of-living increases. *See* 4 Rec. at 618–19. We hold that appellees' proffered reason for the Personnel Department's rebuff was a pretext. Stated another way, we hold that appellees did not bear their burden of producing a rebuttal to Morrison's prima facie case that she, a black employee seeking advancement in spite of seemingly prohibitive rules, was treated differently from white employees who also sought circumvention of established procedures. We remand to the district court to determine Morrison's damages and to decide whether she is entitled to an award of attorney's fees.

AFFIRMED in part, REVERSED in part, and REMANDED.