[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15260
Non-Argument Calendar
_____

D.C. Docket No. 4:13-cv-00642-WS-CAS

PAMELA CHAMBERS,

                                               Plaintiff-Appellant,

versus

STATE OF FLORIDA DEPARTMENT OF TRANSPORTATION,

                                               Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(September 9, 2015)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Paula Chambers appeals the district court's order granting the Florida Department of Transportation ("DOT") summary judgment in her employment-discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) ("Title VII"), and the Florida Civil Rights Act, Fla. Stat. § 760.10(1)(a) ("FCRA").  On appeal, Chambers argues that genuine issues of material fact exist as to whether the DOT's articulated reason for terminating her employment—poor work performance for an extended period of time—was a pretext for race discrimination.[1]  After careful review, we affirm.

## I.

Chambers worked for the DOT in several capacities from 2004 until her termination in September 2012.  She began in the DOT's Comptroller's Office before being promoted to the DOT's Office of Work Program in 2008.  At some point, Chambers became a Work Program Analyst ("analyst") for Statewide Programs in the Office of Work Program, the position she retained until her termination.

Her work as an analyst was more complex than her work in the Comptroller's Office, requiring her to conduct independent analysis, make recommendations, and adapt to changing circumstances.  Analysts monitored and

---

[1] Chambers also included in her complaint a claim of retaliation under Title VII, 42 U.S.C. § 2000e-3, which the district court dismissed by separate order earlier in the proceedings. Chambers expressly abandons her retaliation claim on appeal, so we do not address it further.

analyzed programming and expenditures for statewide programs, and they worked closely with program managers and district representatives. The program managers and district representatives frequently communicated with Chambers and relied on her for advice based on reports she would run.

When she began as an analyst, Chambers and two other analysts, Iman Ameen and Lee Calhoun, were supervised by Paula Warmath, then Manager of Statewide Programs. In March 2011, on their respective annual Employee Performance Evaluations, Warmath gave the three analysts overall ratings of 2.29 (Chambers), 4.20 (Ameen), and 4.11 (Calhoun).[2]

On Chambers's evaluation, Warmath commented that the quality of Chambers's work "consistently does not achieve the performance expectation for the position" and was "not at the level that it should be for the length of time that she has worked in the Office of Work Program." Further, Warmath stated,

> Ms. Chambers frequently has difficulty demonstrating required knowledge of how to perform some of the basic requirements of her job. She requires frequent and excessive supervision and prompting to complete daily work activities. She consistently has had difficulty with providing complete, timely and correct work products. When asked to update her supervisor on issues that are routine and should be addressed daily, she frequently is

---

[2] A rating of 3 is the minimum satisfactory rating and means that the "[e]mployee consistently meets and may occasionally exceed the performance expectation of the position." A rating of 2 means that the "[e]mployee exhibits inconsistent job performance, but has the capacity to improve to meet the performance expectation of the position." A rating of 4 indicates that the employee meets and often exceeds expectations. In the evaluations, employees are rated in various categories, and those individual ratings are used to calculate an overall rating.

not able to determine the reports and other supporting documentation that [are] needed to perform analysis even after receiving detailed and repetitive instruction sometimes both [] orally and in writing.

The evaluation reflects that it was reviewed by Kendra Sheffield, Warmath's supervisor, who commented, "This is a very analytical position and so far Ms. Chambers does not show the ability to analyze the data and make recommendations on her own." Chambers attributed her poor evaluation to a hospitalization around that time, missing reports that were not her fault, and a hostile working environment created by Warmath.

Due to the unsatisfactory evaluation, Warmath placed Chambers on a 90-day performance improvement plan ("PIP"). During the PIP period, Chambers met with Warmath often and Sheffield occasionally to receive coaching and assistance. Chambers completed the PIP plan in June 2011. In a performance review at the end of PIP period, Warmath gave Chambers an overall rating of 3.00, which was at the bottom of the satisfactory performance range. In March 2012, Warmath again gave Chambers a rating of 3.00 for her annual performance review.

Warmath retired in June 2012, and Susan Wilson took over as Manager of Statewide Programs. Around that time, Warmath informed Wilson that Chambers may need help maintaining her performance. Wilson claimed that she immediately noticed problems with Chambers's work performance, and she shared her concerns with Sheffield. For her part, Chambers contended that Wilson was overly critical

4

and hostile and failed to give any meaningful guidance about what Chambers was doing wrong or how she could improve.

In July 2012, Wilson sought guidance from the DOT's Employee Relations Manager, Robert Framingham, about how to address Chambers's performance issues. Framingham told Wilson that a second PIP for the same issue—poor work performance—was not consistent with DOT policy, and he suggested that dismissal may be appropriate if Chambers again was not meeting work expectations. Framingham recommended that Wilson conduct a special evaluation to confirm Chambers's poor work performance.

In early August 2012, the Director of the Office of Work Program, Lisa Saliba, met with Wilson, Sheffield, and Chambers. Saliba discussed with Chambers the concerns about her work performance and advised her that she could be dismissed if her performance did not improve significantly.

Wilson completed the special evaluation later in August 2012, giving Chambers a rating of 2.30, which was below performance standards. Among other specific comments on the evaluation, Wilson summarized Chambers's work performance as follows:

> The work required of this position is varied and complex and cyclical in nature (cyclical on an annual basis). Ms. Chambers is able to adequately perform the duties which are repetitive on a daily basis. However, that is a small percentage of the overall duties of this position. Ms. Chambers struggles to perform the remaining duties,

5

> which are not repetitive and which require independent, analytical work. After almost four years in this office, Ms. Chambers is still unable to grasp many of the fundamentals of the work that she is responsible for performing.

Sheffield again reviewed the evaluation, commenting that Chambers was unable to handle the duties requiring independent analysis and recommendations. Chambers met with Sheffield and Wilson to talk about the special evaluation on August 21, 2012. At the meeting, Chambers wrote on the evaluation that she believed Wilson's negative review was because of her race, citing an incident several years before in which Wilson made a "racial comment" about Chambers.

Regarding the "racial comment" incident, Chambers, who describes herself as black, elaborated at her deposition and in an affidavit that, in 2008, she was in an elevator along with two other black DOT employees when Wilson boarded on the first floor, believing that the elevator was going up. The elevator instead proceeded to the basement, where one of the employees delivered documents while Chambers and the other employee held the doors open to allow the employee to deliver the documents and re-board. When the three black employees left the elevator on the first floor, Wilson stated "sorry ass niggers" and audibly pressed the elevator button.[3]

---

[3] Wilson's denies having made this comment, but we resolve this factual dispute in favor of Chambers's account of events. *See Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1203 (11th Cir. 2010) (all reasonable factual doubts are resolved in favor of non-movant).

On August 31, 2012, Chambers received a letter informing her that she was going to be terminated because of poor work performance and that she had a right to a pre-determination conference.  That conference was held on September 7, 2012.  According to Saliba, Chambers did not deny the bases for her dismissal at the conference.  After the conference, Chambers was issued a formal notice of termination for poor performance.  Chambers was replaced by a white employee.

## II.

After filing a charge of discrimination and receiving her right-to-sue letter from the Equal Employment Opportunity Commission, Chambers filed her complaint in Florida state court.  The DOT removed the action to the United States District Court for the Northern District of Florida and later moved for summary judgment.  The district court granted summary judgment to the DOT, concluding that Chambers failed to show that the DOT's legitimate non-discriminatory reason for her termination—poor work performance over an extended period of time— was a pretext for intentional discrimination.  The court found unpersuasive and unsupported by the record Chambers's contention that she was targeted by Wilson because of her race.  Chambers now appeals.

## III.

We review a district court's grant of summary judgment *de novo*, viewing the facts and the reasonable inferences drawn from those facts in the light most

7

favorable to the non-moving party.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).  Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  Therefore, summary judgment may be granted "[i]f the evidence is merely colorable or is not significantly probative."  *Id.* at 249-50, 106 S. Ct. at 2511 (citations omitted); *see Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (stating that a mere scintilla of evidence in support of the nonmoving party is insufficient to defeat summary judgment).

## III.

Title VII and the FCRA prohibit employers from discriminating against their employees on the basis of race, among other protected grounds.[4]    42 U.S.C. § 2000e–2(a)(1); Fla. Stat. § 760.10(1)(a).  Where, as here, the plaintiff offers only circumstantial evidence of discrimination, we generally apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

[4] We analyze Chambers's claim under the FCRA under the same legal framework as her Title VII claim because the FCRA is patterned after Title VII.  *See Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004) ("The Florida Civil Rights Act was patterned after Title VII, and Florida courts have construed the act in accordance with decisions of federal courts interpreting Title VII.").

792, 93 S. Ct. 1817 (1973).  *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).

Under this framework, if the plaintiff establishes a *prima facie* case and the

employer proffers a legitimate, non-discriminatory reason for the adverse

employment decision, the plaintiff may then show that the employer's proffered

reason was not the true reason but instead was a pretext for discrimination.[5]  *Id*.;

*see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752

(1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it

is shown *both* that the reason was false, *and* that discrimination was the real

reason.").  At the pretext stage, the plaintiff's burden of rebutting the employer's

proffered reason "merges with the plaintiff's ultimate burden of persuading the

court that the employer intentionally discriminated against her."  *Alvarez v. Royal

Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

Here, only the question of pretext is disputed.[6]  To show pretext, Chambers

"must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for

---

[5] The burden-shifting framework of *McDonnell Douglas* "is not, and was never intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, a triable issue of fact arises "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id.*  (internal quotation marks omitted).

[6] Chambers also contends that she established a *prima facie* case of discrimination, but the district court resolved the case based on her failure to show pretext, and the DOT does not argue that she failed to establish a *prima facie* case.  Therefore, we assume that Chambers made out her *prima facie* case and proceed directly to the question of pretext.

its action that a reasonable factfinder could find them unworthy of credence." *Id.* (citation and internal quotation marks omitted).  Chambers must meet the DOT's proffered reason head on and rebut it, and cannot simply recast the reason, quarrel with the wisdom of the reason, or substitute her own business judgment for the DOT.  *See id.* at 1265-66.

As she did before the district court, Chambers argues that she has shown pretext because Wilson's specific criticisms of her work performance were inaccurate or exaggerated, she was treated worse than similarly situated non-black employees, the DOT did not follow its "progressive disciplinary policy" before firing her, and Wilson previously used a racial slur in Chambers's presence.  She also broadly contends that the district court erred in applying the summary-judgment standard by not viewing the evidence in her favor.

Overall, we agree with the district court that Chambers's evidence does not create a triable issue on whether the DOT's legitimate non-discriminatory reason for her termination was a pretext for unlawful discrimination.  *See Hicks*, 509 U.S. at 515, 113 S. Ct. at 2752; *see Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. Chambers presents only one piece of evidence suggesting that the DOT's proffered reason may have actually been a pretext for racial discrimination:  Wilson's alleged racial slur about Chambers and two other black employees in 2008.  This discriminatory comment, unrelated to the employment decision, certainly

10

contributes to a circumstantial showing of discriminatory animus. *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002). But Wilson's isolated comment, made nearly four years before the termination decision, when Wilson was not Chambers's supervisor, is insufficient on its own to establish a material fact on pretext. *See id.*; *see also Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002) ("Although a comment unrelated to a termination decision may contribute to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext." (citation omitted)).

Chambers has presented no other evidence of pretext sufficient to create a genuine issue of fact. She does argue at length that Wilson "concocted" Chambers's alleged poor work performance in order to have her fired, contending that Wilson's complaints about the quality of her work are unfounded, mistaken, or overblown, and she contends that she rebutted each of the particular examples Wilson cited as demonstrating Chambers's poor performance. In essence, Chambers claims that Wilson wrongly evaluated her job performance.

"[B]ut the fact that [Chambers] thinks more highly of her performance than her employer does is beside the point." *Alvarez*, 610 F.3d at 1266. Whether Wilson accurately assessed Chambers's job performance is not our inquiry, and "we must be careful not to allow Title VII plaintiffs simply to litigate whether they

are, in fact, good employees." *Id.* (quoting *Rojas*, 285 F.3d at 1342).  Our inquiry into pretext focuses on the employer's beliefs, not the employee's.  *Id.* at 1265. Thus, the central question is whether Wilson and the DOT actually were dissatisfied with her for non-discriminatory reasons, "even if mistakenly or unfairly so, or instead merely used those complaints about [Chambers] as cover for discriminating against her because of her [race]."  *Id.*; *see Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) ("[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory . . . .").  Our role is to prevent unlawful employment practices, not to second-guess employers' business judgments.  *See Rojas*, 285 F.3d at 1342.

Even assuming that Wilson inaccurately or unfairly scrutinized and evaluated her work performance, Chambers has not presented evidence suggesting that Wilson was not honestly dissatisfied with Chambers's work.  *See Alvarez*, 610 F.3d at 1265.  For starters, this is not a case where an employee with a good employment history suddenly began receiving poor evaluations when a new supervisor came on.  *Cf. Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361-65 (11th Cir. 1999) (finding sufficient evidence of pretext where an older store manager began receiving negative evaluations from a new

supervisor, where the factual basis of the poor evaluation was challenged and there was other evidence of discrimination, including a pattern of the supervisor's termination of older, experienced store managers for similar reasons and replacement of them with younger employees). Though, even if that were the case, it would not necessarily be evidence of pretext. *See Rojas*, 285 F.3d at 1343 (noting that different supervisors may permissibly impose different evaluation standards).

Rather, the evidence is that Chambers was, at best, an inconsistent performer as an analyst. She received a negative performance review from Warmath in March 2011, before any alleged discrimination began, which is consistent with Wilson's August 2012 evaluation. Although Chambers then received satisfactory ratings from Warmath in June 2011 and March 2012, she received the minimal acceptable ratings. Moreover, Warmath testified that she felt, nonetheless, that Chambers "was a borderline employee." Warmath stated that she gave Chambers "the benefit of the doubt" in her March 2012 evaluation because Warmath "had seen some potential on some days that maybe she would be able [to] continue to improve." Warmath also told Wilson that Chambers may need help maintaining her performance. Given that Chambers had been previously evaluated as below standards or as at the minimum level of meeting standards, Wilson's poor

13

evaluation of Chambers does not suggest pretext in these circumstances. *Cf. Rojas*, 285 F.3d at 1343.

Chambers also claims that pretext based on the assertion that she was treated differently than similarly situated employees. She contends that, from the moment Wilson became her supervisor, Wilson was abusive, hostile, and overly critical, and that she generally treated Chambers worse than Ameen and Calhoun, who are outside of Chambers's protected class. For example, Chambers alleged, during group meetings, Wilson would give sarcastic answers or comments to Chambers's questions, but not to those of her co-workers. Wilson once told Chambers that she was wasting other people's time when she asked questions. Chambers also points to Kimberly Ferrell, a budget director who was demoted and transferred as the result of a budgetary error, as a comparator outside of her protected class who was treated differently.

For disparate treatment of employees outside of the plaintiff's protected class to constitute circumstantial evidence of discrimination, "[t]he plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Id.*

14

Here, Chambers cannot show pretext through the DOT's disparate treatment of comparators because her proffered comparators were not similarly situated to her—none had a history of poor work performance. Warmath's testimony reflects that Ameen and Calhoun performed at a higher level than Chambers and were regarded as experts in their respective program areas. Neither employee had been placed on a PIP nor required the level of assistance that both Warmath and Wilson described Chambers as needing. As for Ferrell, she was a higher-level employee who was not supervised by Wilson and was not terminated by Saliba. In addition, although Chambers asserts that Ferrell was demoted, but not terminated, for a budgetary error, the evidence does not reflect that Chambers was terminated solely because of a budgetary error. Rather, the budgetary error identified by Wilson was just one of many examples she cited as informing her evaluation of Chambers's deficient work performance. In short, Chambers has not shown that she was treated worse than a similarly situated employee outside of her protected class.

Finally, although an employer's failure to follow its own policies may be evidence of pretext, *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination."), Chambers has not shown that the DOT's alleged failure to follow its disciplinary policy supports a finding of pretext in this case. The disciplinary policy confers substantial discretion on the decision maker as to whether and when to invoke the

15

various disciplinary options identified in the policy, including dismissal, and Chambers offered no evidence showing that the DOT applied the policy differently to Chambers than it did to other employees.

Having found no evidence sufficient to create a genuine issue of fact on pretext, we affirm the district court's entry of summary judgment in favor of the DOT.

**AFFIRMED.**