[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12679
Non-Argument Calendar
_____

D.C. Docket No. 8:15-cv-00386-JSM-TBM


PAUL DEBENE,

Plaintiff-Appellant,

versus

BAYCARE HEALTH SYSTEM, INC.,
WAGEWORKS, INC.,
In its official capacity as Administrator of an ERISA plan
maintained by Benefit Concepts, a division of WageWorks, Inc.,
for the benefit of employees of Baycare Health System, Inc.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 31, 2017)

Before ROSENBAUM, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Paul DeBene appeals the district court's grant of summary judgment to his former employer, BayCare Health System, Inc. ("BayCare"), on his claims of retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and failure to provide a benefits-election notice under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). On appeal, DeBene argues that his claims should survive summary judgment because the record contains genuine issues of material fact. After careful review of the record and the parties' briefs, we affirm the district court's grant of summary judgment to BayCare.

## I. Background

Construed in the light most favorable to DeBene, the relevant facts are these. From 2004 to 2014, DeBene worked for BayCare, a community-based health system in the Tampa Bay area that is composed of a network of fourteen not-for-profit hospitals and numerous other outpatient facilities and services. DeBene specifically worked for BayCare Purchasing Partners, a regional group-purchasing organization within BayCare that was responsible for contracting for the supplies and services used in BayCare's operations. DeBene was a Senior Contract Manager at the time of his termination. DeBene worked with over 200 BayCare vendors and had over 280 contracts in his portfolio.

2

For most of the time relevant to this case, DeBene reported to Richard Frankenfield, the Director of Contracts. Frankenfield, in turn, reported to Judy Lipscomb. Alan Wilde replaced Lipscomb in June 2014, about three weeks before DeBene's termination in early July 2014.

## A.    *The Protected Activity*

On April 27, 2012, DeBene called BayCare's Corporate Responsibilty Compliance Line to report that a former BayCare employee, Jennifer Goggin, had been sexually harassed by her department manager, John Higgins. Goggin, with whom DeBene was romantically involved, had recently been terminated by BayCare for performance issues. BayCare investigated DeBene's report and, as part of that investigation, interviewed DeBene. The investigation corroborated the allegations of inappropriate workplace conduct, and Higgins was terminated.

Around this time, Frankenfield told Lipscomb that DeBene had been "bullying" and "badgering" coworkers to protest Goggin's termination. Goggin testified that Frankenfield and Higgins were friends who often lunched together. DeBene believes that, after Higgins's termination, Frankenfield harbored a grudge against him. Nevertheless, DeBene testified that his relationship with Frankenfield was cordial both before and after the sexual-harassment complaint.

## B.    *DeBene Applies for Regional Contract Manager Position*

3

In early 2014, BayCare reinstated the position of Regional Contract Manager, which DeBene had held for about five years until the position was eliminated in 2009. DeBene applied for the reinstated position but was not hired. According to BayCare, DeBene was rejected because he did not have a college degree, a prerequisite for the position. DeBene believes that BayCare could have adjusted the job requirements to allow practical experience in lieu of a degree.

Ultimately, BayCare hired Karrey Pecore, who became DeBene's direct supervisor. Frankenfield made the hiring decision with input from Lipscomb. Lipscomb testified that it was clear to both her and Frankenfield that Pecore, who had both a bachelor's and master's degree in Health Administration, was the best candidate. Lipscomb explained that Pecore had "national experience in a group purchasing organization" and an outside perspective that BayCare thought would be helpful because most of its employees were "ingrown people."

C.　　*BayCare's Policies on Conflicts of Interest and Secondary Employment*

BayCare maintains policies regarding conflicts of interest and obtaining secondary employment. Its policies instruct employees that they have a duty of loyalty to BayCare, which it defines as "an allegiance to the mission of BayCare and no personal interest when considering the business affairs of the corporation and the best interests of the corporation." Employees were permitted to obtain

4

secondary employment so long as the employment did not represent a conflict of interest.

These policies embrace liberal disclosure of any potential conflicts. The secondary employment policy directs employees to notify their supervisor if they wish to seek secondary employment so that the proposed secondary employment can be reviewed for actual or potential conflicts. The conflicts-of-interest policy likewise states that employees are required to fully disclose any private, business, or professional relationship where a potential or actual conflict of interest exists. The policy identifies specific types of activities which should be disclosed as potential conflicts, including, among other "Outside Interests & Activities," "[h]aving a compensation arrangement . . . with any entity or individual with which BayCare transacts business."

To ensure compliance with the conflicts-of-interest policy, employees are required to complete an annual disclosure statement in which they detail existing or potential conflicts and affirm that they have read, understood, and agree to comply with the conflicts-of-interest policy. Disclosed conflicts are reviewed by a Conflict of Interest Determination Committee. The policy warns that "[f]ailure to disclose any conflict or seek approval may result in termination."

D.    *Facts Leading to DeBene's Termination*

5

During his employment with BayCare, DeBene also worked part-time as a "data mapper" for Deman Data Solution, LLC ("DDS"), and Primrose Solutions, LLC ("Primrose"). DDS and Primrose are both software development firms that provided software programs to BayCare to analyze its purchasing and inventory of hospital supplies and to provide pricing benchmarks. Baycare used DDS's software from around 2003 until November 2012, when Baycare entered into a contract with Primrose. While working for Primrose, DeBene at times worked on BayCare's data.

In June 2014, DeBene disclosed to BayCare for the first time that he had been working part-time for DDS and Primrose. DeBene made that disclosure after learning that DDS and Primrose were in litigation and that BayCare employees had been subpoenaed to testify in that case. DeBene wanted to avoid having that information surprise BayCare during the litigation. On June 26, 2014, he amended his annual conflict disclosure form, which had disclosed no conflicts, to disclose his employment with Primrose.

A few days later, on June 30, 2014, DeBene met with Frankenfield to discuss the matter. DeBene explained that he did not believe his work for Primrose needed to be disclosed because he was an independent contractor and he was not working in a consultant capacity. Thereafter, Frankenfield met with Wilde, who had recently taken over for Lipscomb, and James Bacon, the Director of Team

6

Resources, to discuss the matter.  After an additional meeting between DeBene, Wilde, Frankenfield, and Bacon on July 2, 2015, BayCare decided to terminate DeBene's employment.

The next day, July 3, 2015, Wilde, Frankenfield, and Pecore met with DeBene to let him know that he was being terminated.  Frankenfield did all of the talking.  According to Frankenfield, DeBene's decision to have and not disclose secondary employment with BayCare's suppliers demonstrated poor judgment that negatively impacted his credibility, violated BayCare's policies, and betrayed BayCare's key values of trust and loyalty.

E.    *Post-Termination Facts Regarding COBRA Notice*

DeBene has a pacemaker in his chest and so was concerned about maintaining his health-insurance coverage following his termination.  He states, however, that he did not timely receive his COBRA election notice from BayCare so as to continue with his coverage from BayCare.  So, on August 25, 2014, DeBene called BayCare.  He reached Angela Williams, the Senior Benefits Specialist at BayCare, who misinformed him that he was ineligible for COBRA benefits because he had been terminated for gross misconduct.  At her deposition, Williams explained that she misread the coding of DeBene's termination, MSCND GN, which actually meant misconduct general.  (Gross misconduct was coded as MSCND GR.)

7

Thereafter, DeBene contacted both BayCare's plan administrator and the Department of Labor about the fact that he had not received a COBRA notice. The plan administrator again sent the COBRA election package and extended DeBene's election period.

BayCare maintains that a COBRA election notice was timely sent to DeBene on July 23, 2014, even if he did not receive it. During the relevant time, BayCare contracted with Benefit Concepts to, among other things, provide initial COBRA election notices to qualifying former employees of BayCare. BayCare exports its benefits data files directly to Benefit Concepts for all loss-of-coverage events, including termination of employment. Once Benefit Concepts receives the information from BayCare, it is loaded into Benefit Concepts's system, and an election notice is generated and printed. A fulfillment clerk places the letter in an envelope and delivers it to the post office to be sent via first-class mail to the last known address of the participant.

Evidence produced at summary judgment reflected that DeBene was coded into BayCare's database as COBRA eligible on July 3, 2014, that this information was transferred to Benefit Concepts, and that a COBRA election notice dated July 23, 2014, was generated and printed for DeBene. Further, BayCare also provided evidence showing that other recipients of notices mailed on the same day as DeBene's were able to successfully elect coverage and that no other former

8

employee reflected on the report of letters sent on that date had reported not receiving his or her notice.

## II.  Discussion

We review a district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in favor of the non-moving party.  *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### A.    *Title VII Retaliation Claims*

Title VII prohibits employers from retaliating against employees for engaging in activity protected by Title VII, such as opposing practices made unlawful by Title VII or participating in a Title VII investigation.  *See* 42 U.S.C. § 2000e–3(a).  Both parties agree that the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to DeBene's retaliation claims based on circumstantial evidence.

Under this framework, a plaintiff must first make out a *prima facie* case of retaliation, which consists of the following elements: (1) he engaged in a protected

9

activity; (2) he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Id.* at 1364. "But mere temporal proximity, without more, must be very close." *Id.* (internal quotation marks omitted).

If the plaintiff makes out a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Crawford*, 529 F.3d at 976. After the employer has met its burden, the plaintiff then has the opportunity to show that the employer's proffered explanation is simply a pretext for retaliation. *Id.* "The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Id.* (internal quotation marks omitted). Thus, the pretext inquiry focuses on the employer's beliefs and whether the employer provided an honest explanation for its actions. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). The

10

employee's beliefs, whether about his own qualifications or the wisdom of the employer's decision, are largely irrelevant to the inquiry.  *See id.*

### 1.    Retaliatory Failure to Promote

DeBene claims that BayCare failed to promote him in retaliation for participating in an investigation into sexual harassment by a supervisor who was friends with Frankenfield.  BayCare responds that DeBene was not promoted for the simple reason that he did not meet the job requirements because he did not have a college degree.  BayCare also produced evidence showing that it viewed Pecore, the person who was hired, as the best qualified candidate.  Even assuming without deciding that DeBene could make out a *prima facie* case, DeBene's evidence is insufficient to establish pretext.

DeBene's claim hinges on Frankenfield's alleged retaliatory animus, but no evidence exists in the record that Frankenfield developed the job requirements for the position or that he attempted to influence any BayCare employee who did.  So the fact that he was not considered for the position appears to have no connection to any alleged retaliatory animus.

Moreover, DeBene's contention that he was more qualified and had more experience than Pecore is a nonstarter.  It is well established that, "[i]n the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he

11

coveted." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (internal quotation marks omitted).  Rather, the disparities in qualifications must be "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  *Id.* (internal quotation marks omitted).  Here, DeBene has fallen far short of making that showing.  Accordingly, the district court properly granted summary judgment on this claim.

<u>2.    Retaliatory Termination</u>

Next, DeBene claims that his termination was in retaliation for his participation in the sexual-harassment investigation against another supervisor. BayCare responds that DeBene was terminated because he violated BayCare's policies with respect to secondary employment, conflicts of interest, and trust and loyalty, by failing to disclose for years that he had been working for BayCare's software vendors.  Again, even assuming without deciding that DeBene met his *prima facie* case regarding his termination, he has not established that BayCare's proffered reasons for his termination are pretextual.[1]

---

[1] An additional question arises about the extent to which Frankenfield's alleged retaliatory animus can be imputed to BayCare under the "cat's paw" theory, since it is undisputed that Wilde, the ultimate decision maker, was not aware of DeBene's protected activity at the time of the termination decision.  In any case, we need not resolve that question because summary judgment was appropriate even assuming that Frankenfield was the relevant decision maker.

DeBene first argues that BayCare's proffered reasons are pretextual because no actual or even potential conflict of interest arose. He states that the work he was doing for DDS and Primrose was simply cleaning up data and that this work in no way was adverse to BayCare's interests.

But DeBene's opinion that his secondary employment did not create a conflict of interest is immaterial because the pretext inquiry centers on BayCare's beliefs. *See Alvarez*, 610 F.3d at 1266. And DeBene offers no reason to doubt that BayCare did not honestly believe that DeBene had violated BayCare's policies on conflicts of interest and secondary employment by failing to disclose for years that he had been working for BayCare's software vendors. In fact, DeBene does not appear to dispute that this secondary employment should have been disclosed under the terms of the policies. Nor could he, as the conflicts-of-interest policy specifically lists, among other examples of potential conflicts, "[h]aving a compensation arrangement . . . with any entity or individual with which BayCare transacts business." Whether an actual conflict existed or not is largely irrelevant. DeBene cannot prevail simply by quarreling with the wisdom of BayCare's reasons or with its application of its own rules. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.").

DeBene's suggestion that it was pretextual for BayCare not to submit his belatedly disclosed conflict to the Conflict of Interest Committee is off the mark. The conflicts-of-interest policy indicates that the committee reviewed potential conflicts that employees listed on annual disclosure statements, but DeBene failed to disclose any potential conflicts for the committee to review until just before his termination. And the policy states that the "[f]ailure to disclose any conflict or seek approval may result in termination." Nothing in the policy suggests that BayCare would review a conflict that an employee repeatedly failed to disclose. Thus, BayCare's actions were consistent with its policies and are not suggestive of pretext. *See Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) (not following established procedures can show pretext).

DeBene next contends that he has shown pretext because he was treated less favorably than Melissa Monreal, another employee who violated the same work rule based on the same type of work for Primrose. Monreal was demoted and informed that she could no longer work as a manager, but she was not fired, like DeBene, and she was provided the opportunity to find a non-management position within the company within forty-five days.

DeBene is correct that differential treatment based on a violation of the same work rule can show pretext when an employee outside the protected class was not similarly treated. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354,

14

1363 (11th Cir. 1999).  But in order to show pretext, the plaintiff must demonstrate that the comparators are similarly situated in all relevant respects.  *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).  We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions.  *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 & n.2 (11th Cir. 2006).

Here, DeBene has not established that Monreal was similarly situated for purposes of showing pretext.  The record shows that Monreal worked for Primrose for a matter of months, was not aware of BayCare's vendor relationship with Primrose when she began working there, and never completed an annual disclosure form in which she knowingly failed to disclose her secondary employment with Primrose.  By contrast, DeBene for years held secondary employment with BayCare's software vendors, first with DDS and later with Primrose, and repeatedly and knowingly failed to disclose those potential conflicts.  Thus, the quantity and quality of Monreal's misconduct is not sufficiently similar to DeBene's to be comparable.

In addition, DeBene and Monreal were disciplined by different supervisors, which further distinguishes their situations.  *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("[D]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.").  Indeed,

15

DeBene recognizes that "Monreal's supervisor was the one who gave her the protection that was denied to Paul DeBene."

DeBene claims that the differential treatment by different supervisors is evidence of pretext because Frankenfield was motivated by retaliatory animus, while Monreal's supervisor was not. But the evidence of Frankenfield's retaliatory animus is weak to non-existent. DeBene speculates that Frankenfield had it out for DeBene ever since the sexual-harassment complaint because Frankenfield was friends with the fired supervisor. In support, he points to Frankenfield's comment to Lipscomb that DeBene had "bullied" and "badgered" coworkers to protest Goggin's termination. Even assuming that the comment, entirely unrelated to the termination decision, could be construed as circumstantial evidence of retaliatory animus, it is not sufficient on its own to establish pretext. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002). Further, DeBene does not explain, besides sheer speculation, how Frankenfield's "shaky ethics" make it more likely that DeBene was fired for retaliatory reasons. We agree with the district court that these "arguments are simply too speculative to suggest that retaliation was the *real* reason behind Frankenfield's actions." Indeed, DeBene testified that his relationship with Frankenfield was cordial both before and after the sexual-harassment complaint.

16

In sum, we conclude that DeBene has not shown that BayCare's reasons for its employment decisions were pretextual, and we affirm the district court's entry of summary judgment on his Title VII retaliation claims.

## B.    COBRA Notification

DeBene claims that BayCare violated COBRA by failing to provide notice of his right to continue healthcare coverage following his termination.  BayCare responds that its actions were sufficient to comply with its obligations under COBRA even if DeBene did not timely receive his notice.

COBRA provides that employers must allow former employees the opportunity to continue healthcare coverage under the employer's plan if a qualifying event occurs.  *See* 29 U.S.C. § 1161.  Termination for reasons other than an employee's gross misconduct is a qualifying event.  *Id.* § 1163(2).  Under COBRA, an employer—through its healthcare administrator—must notify an employee of his right to continue his healthcare coverage after the termination of his employment.  *Id.* §§ 1163(2), 1166.  The employer must notify its healthcare administrator of the employee's termination within 30 days, *id.* § 1166(a)(2), and the administrator then must notify the employee of his continuation right within 14 days, *id.* § 1166(a)(4)(A), (c).  If an employer fails to provide a terminated employee notice of his COBRA rights, the employee may file a civil action to enforce his rights.  29 U.S.C. § 1132(a).

17

Providing notification of COBRA rights is important because employees are not expected to know instinctively of their right to continue their healthcare coverage. *Cummings v. Washington Mut.*, 650 F.3d 1386, 1391 (11th Cir. 2011). Notice must be provided in accordance with the regulations prescribed by the Secretary. 29 U.S.C. § 1166(a). Pursuant to those regulations, the plan administrator "shall use measures reasonably calculated to ensure actual receipt of the material by plan participants." 29 C.F.R. § 2520.104b-1(b)(1). The regulations specify that sending notice by first-class mail is sufficient to meet this requirement. *See id.* The plan administrator must notify plan participants of, among other information, the amount that each beneficiary will be required to pay for continuation coverage. 29 C.F.R. § 2590.606–4(b)(4)(xi).

We have not directly addressed what an employer must do to satisfy its notification obligations under COBRA, though we have indicated what is not sufficient. In *Scott*, we affirmed the grant of summary judgment against an employer on an employee's claim that he never received any COBRA information. *See* 295 F.3d at 1230–31. The employer had argued that it satisfied its good-faith obligation to comply with the statute by providing its plan administrator with the necessary information and instructing the administrator to send the COBRA notice to Scott. *Id.* at 1230. We noted without disapproval that other courts had held that an employer satisfied the statute by sending a notice "in a good faith manner

18

reasonably calculated to reach the plaintiff," but we found that this language could not be stretched to apply in a situation were "there is no evidence that any notice was ever sent by that third party." *Id.* at 1231.  Thus, we concluded that "[s]imply hiring an agent and then instructing the agent to send notice is not sufficient to satisfy the statute, *where there is no evidence that the agent sent out a notice to the plaintiff*, nor any evidence that the principal took the necessary steps to ensure that the agent would, in all cases, make such notification." *Id.* (emphasis added).

Here, both parties agree that the critical issue is whether there is a genuine issue of material fact as to whether a COBRA notice was mailed to DeBene.  On this record, we agree with the district court that BayCare provided sufficient undisputed evidence to show that it mailed DeBene a COBRA letter.  BayCare produced evidence of its and Benefit Concepts's routine procedures regarding the preparation and mailing of COBRA election notices and how they were followed with respect to DeBene's COBRA notification.  BayCare also provided a copy of DeBene's July 23, 2014, COBRA letter, which included his premium amount and enrollment form, and a report from Benefit Concepts showing that the letter was sent on that date.  In addition, BayCare also provided evidence showing that other recipients of notices mailed on the same day as DeBene's were able to successfully elect coverage and that no other former employee reflected on the report of letters sent on that date had reported not receiving his or her notice.  In light of this

19

undisputed evidence, we conclude that BayCare has met its obligations under COBRA.  *See* 29 C.F.R. § 2520.104b-1(b)(1); *cf. Scott*, 295 F.3d at 1230–31.

DeBene's arguments to the contrary are unavailing.  The fact that BayCare's Benefits Administrator told DeBene that he was COBRA ineligible because he was terminated for gross misconduct does not create a question of material fact because, as the district court stated, "[H]er mistaken belief has no bearing on whether or not the COBRA notice was sent."  Nor is there any evidence that someone at BayCare directed Benefit Concepts not to send DeBene a COBRA letter or that the coding of his termination had been changed in order to reflect that he was eligible, after he called.  In fact, the only evidence in the record on this point indicates that DeBene was coded in BayCare's benefits system as COBRA eligible on July 3, 2014, and that this information was transferred to Benefit Concepts on July 22, 2014.

For these reasons, we affirm the district court's grant of summary judgment to BayCare on DeBene's COBRA claim.

**AFFIRMED.**